Michael PAUL, By and Through his Mother and Legal Guardian Helen V. PAUL, Daniel J. Paul and Helen V. Paul, Plaintiffs,

v.

RAWLINGS SPORTING GOODS COMPANY, Defendant,

v.

EAST MUSKINGUM BASEBALL LEAGUE, Chandlersville Youth League, Bethesda Hospital, Fisher Mangold Group and Dr. Dan Brown.

No. C2-86-0274.

United States District Court, S.D. Ohio, E.D.

Nov. 8, 1988.

As Corrected Nov. 22, 1988.

Peter J. Brodhead, Robert V. Traci, Spangenberg, Shibley, Traci & Lancione, Cleveland, Ohio, Clay P. Graham, Graham, McClelland, McCann & Ransbottom, Zanesville, Ohio, for plaintiffs.

Robert D. Monnin, Edward F. Whipps, Linda R. Sogg, Thompson, Hine and Flory, Columbus, Ohio, Daniel Patterson, Auburn, Cal., for defendant.

Michael J. Micheli, Micheli & Micheli, Walter K. Chess, Jr., Zanesville, Ohio, Vincent J. Lodico, Columbus, Ohio, for third party defendants.

OPINION AND ORDER

TERENCE P. KEMP, United States Magistrate.

## I. INTRODUCTION

This matter is before me to decide the motion of Rawlings Sporting Goods Company ("Rawlings") to disqualify Werner Goldsmith, Ph.D., as plaintiffs' expert witness. That motion was filed on August 23, 1988 together with a supporting affidavit. Plaintiffs, Michael Paul, et al. ("Paul") responded and filed a counteraffidavit on September 20, 1988. Rawlings filed a reply brief on October 11, 1988. With that reply brief, Rawlings submitted tape recordings and transcriptions of telephone conversations between Daniel Patterson, one of Rawlings' counsel, and Dr. Goldsmith, together with a motion for a protective order. Paul immediately responded to that filing by moving, on October 13, 1988, for an order requiring production of the tapes and transcripts. Paul also moved for leave to file a sur-reply brief and attached a copy of the proposed brief. That motion is granted, and I will consider the legal arguments raised in the sur-reply brief in addition to those contained in the other briefs filed.

After briefing on the motion was complete, I conferred with interested counsel by telephone to schedule an evidentiary hearing on the motion. The hearing was held on October 31, 1988. The following represent my findings of fact, discussion, and order with respect to the motion to disqualify Dr. Goldsmith as an expert witness.

## II. FINDINGS OF FACT

1. Daniel Patterson is a California attorney who serves as national coordinating counsel for Rawlings. One of his specific assignments is to contact and retain expert witnesses for the defense of products liability lawsuits filed against Rawlings. He has retained experts in such fields as epidemiology, mechanical engineering, and biomechanics. He obtains authority to retain experts primarily from Jack Mangus, an insurance adjuster who is involved in Rawlings litigation.

2. Dr. Werner Goldsmith is a professor emeritus of mechanical engineering at the University of California at Berkeley. He has taught courses in biomechanical engineering in the past. He is recognized as an expert in the field of testing baseball helmets, having co-authored an article with J. Michael Kabo entitled "Performance of Baseball Headgear" which appeared in the *American Journal of Sports Medicine* in 1982. Some time in 1984 or 1985, Mr. Patterson contacted Dr. Goldsmith for purposes unrelated to any specific litigation matter and the two discussed Dr. Goldsmith's work in the field of testing baseball helmets. During roughly the same time frame, Mr. Patterson read Dr. Goldsmith's article.

3. The instant case involves a claim by plaintiff, Michael Paul, that he was struck on the head by a pitched baseball while participating in an organized baseball game in Zanesville, Ohio. Paul further contends that he was wearing a Rawlings helmet at the time of the incident, and that the helmet was defective because it did not prevent the injury. He apparently suffered an injury described by the parties as an epidural hematoma with a ruptured meningeal artery, which was ultimately accompanied by severe and irreversible brain damage.

4. After this action was filed, Mr. Patterson contacted Dr. Goldsmith in part in order to discuss the possibility of Dr. Goldsmith's serving as one of Rawlings' experts in this case.

5. On approximately January 22, 1987, Mr. Patterson and Dr. Goldsmith spoke by telephone. The primary subject discussed during the course of that conversation was the possibility that Dr. Goldsmith would be retained by Rawlings to set up a testing laboratory at the University of California at Berkeley and that Dr. Goldsmith would test baseball helmets designed by Rawlings and provide Rawlings with the results of his tests as well as suggestions about the way the performance of the helmets could be improved. As a result of his previous studies of baseball helmets, which grew out of his involvement as an expert witness

testifying on behalf of another baseball helmet manufacturer, Dr. Goldsmith had become convinced, and so stated in his 1982 article, that much more research needed to be done in order to determine whether existing baseball helmets adequately protected the heads of baseball players from the impact of a pitched ball.

6. Dr. Goldsmith expressed great interest during the January 22, 1987 telephone conversation in becoming employed by Rawlings to set up a testing laboratory and to perform research for that company. He also advised Mr. Patterson that his hourly billing rate for consulting services was $200 per hour. Mr. Patterson told Dr. Goldsmith that he would be required to obtain approval from his principal to pay Dr. Goldsmith $200 per hour. Mr. Patterson also mentioned the possibility that he might want Dr. Goldsmith to consult on one or more litigation matters then pending, and said that one of them involved a somewhat puzzling injury, described as the rupture of a meningeal artery without a skull fracture.

7. After his telephone conversation with Dr. Goldsmith, Mr. Patterson sought approval from Mr. Mangus, the insurance adjuster, to retain Dr. Goldsmith. The letter seeking such approval, a copy of which was submitted following the evidentiary hearing, does not refer specifically to the *Michael Paul* case but I infer that it does relate to this litigation. That approval was given, and Mr. Patterson then called Dr. Goldsmith on January 28, 1987. One of the purposes of the telephone call was to set up a meeting between the two, and a confirming letter sent by Mr. Patterson's office indicates that the date selected for the meeting was February 12, 1987. Mr. Patterson also told Dr. Goldsmith that he had obtained approval to pay Dr. Goldsmith's rate of $200 per hour. Mr. Patterson believed at that point that he had retained Dr. Goldsmith as a consultant or expert with respect to the *Paul v. Rawlings* litigation, but that the full scope of Dr. Goldsmith's services—in particular, whether Dr. Goldsmith would ultimately be chosen to perform a series of tests on baseball and possibly other types of helmets at his own laboratory—was a matter to be worked out.

8. Dr. Goldsmith and Mr. Patterson met in Dr. Goldsmith's office on February 12, 1987. The meeting lasted approximately 1¼ hours, and included a tour of Dr. Goldsmith's laboratory. Mr. Patterson took to the meeting various documents relating to the *Paul v. Rawlings* litigation, including a medical summary relating to the injuries suffered by Michael Paul, a summary of the statements of witnesses to the accident, and data relating to various tests performed both by Mr. Patterson, and at his direction, at Rawlings' facility in Missouri. Dr. Goldsmith and Mr. Patterson talked generally about testing baseball helmets, and may have discussed the fact that Mr. Patterson or Rawlings had recently run a series of tests with a baseball helmet which was manufactured according to the specifications for the helmet allegedly worn by Michael Paul on the date he was injured.

9. During the course of the meeting, Mr. Patterson inquired about, and Dr. Goldsmith provided his opinion concerning, some specifics as to the way in which baseball helmets should be tested, and the way in which the impact to the skull from a direct blow on a baseball helmet could be measured. One of the specific pieces of information imparted to Mr. Patterson by Dr. Goldsmith was that placing a carbon paper patch or measuring film directly under the point of impact might not be the best way of measuring the impact on the skull because of the wave action which results from a direct blow, and that placing patches or film in other locations might be a better way to measure the impact.

10. During the February 12, 1987 meeting, Mr. Patterson told Dr. Goldsmith that Dr. Albert Berstein, who was known to Dr. Goldsmith, was also doing some helmet testing. Mr. Patterson and Dr. Goldsmith also discussed testing other helmets, such as football or motorcycle helmets, in connection with testing of baseball helmets. Ordinarily, because of the different type of impact which motorcycle and football helmets are designed to withstand, such hel-

mets are not tested in the same manner as baseball helmets.

11. At the conclusion of the February 12, 1987 meeting, the parties contemplated further contact. That contact involved, primarily, additional discussions concerning whether Dr. Goldsmith would be retained to set up a testing laboratory and to do testing for Rawlings. Mr. Patterson also communicated, in some fashion, the fact that he would want to talk to Dr. Goldsmith further about the tests being run by Dr. Berstein and get Dr. Goldsmith's input on whether Dr. Berstein's testing procedures produced valid results, or could be improved in some way.

12. Dr. Goldsmith did not review any documents concerning the *Michael Paul* case during the February 12, 1987 meeting, and he took no notes relating to the case. Although Mr. Patterson had documents with him relating to the case, he did not show those documents to Dr. Goldsmith. There was no discussion during the meeting about Mr. Patterson's providing Dr. Goldsmith with any documentation of any nature relating to the *Michael Paul* case.

13. At some time between February 12, 1987 and April 16, 1987, Dr. Goldsmith made a specific proposal concerning testing Rawlings' products. He suggested that a grant of $15,000 to $20,000 be made directly to him rather than to the University of California, which would allow him to buy certain testing equipment in order to be able to test helmets in accordance with the NOCSAE standards. He also made certain proposals concerning modification of equipment already in his laboratory which he had previously used in testing baseball helmets.

14. During the same time frame, and probably in an April 16, 1987 telephone call, Mr. Patterson talked to Dr. Goldsmith about the preliminary results of the tests run by Dr. Berstein. He stated that when the results were final he would pass them along. He further expressed his continuing puzzlement over the way in which a meningeal artery could be ruptured without a skull fracture having occurred, and Dr. Goldsmith told him that the brain might move enough without a skull fracture to rupture the artery at the area where it exits the brain.

15. On July 14, 1987, Mr. Patterson wrote to Dr. Goldsmith. The letter discussed two subjects. First, it indicated that Dr. Berstein still had not completed his analysis of the pressure-sensitive film which he used in his tests, but as soon as the results were available Mr. Patterson would communicate them to Dr. Goldsmith. Second, Mr. Patterson expressed his continuing hope that a testing laboratory would be set up at the University of California at Berkeley and that Dr. Goldsmith would be available to participate in the testing. Mr. Patterson asked Dr. Goldsmith to call him, at his convenience, concerning that subject.

16. It is unclear whether the parties communicated after July 14, 1987. If they did, the subject matter of such communications related exclusively to setting up a test laboratory and the financial criteria suggested by Dr. Goldsmith.

17. Mr. Patterson was concerned about the arrangement for a testing laboratory proposed by Dr. Goldsmith, both because of the prospect that the equipment would be used at the University of California but the University would have no knowledge of the use of such equipment on its premises, and because Dr. Goldsmith had suffered what Mr. Patterson believed to be a stroke (actually a transient ischemic episode) and did not have another researcher who would carry on the project if Dr. Goldsmith's health prevented him from doing so. For those reasons, Mr. Patterson and his principal ultimately concluded that the testing laboratory would not be placed with Dr. Goldsmith. This decision was never communicated to Dr. Goldsmith.

18. Despite the lack of any meaningful communication concerning any specifics relating to the *Michael Paul* case after April, 1987, Mr. Patterson still considered Dr. Goldsmith to be one of Rawlings' experts in this litigation. He did not, however, attempt to contact Dr. Goldsmith concerning the matter at any time prior to June 3, 1988, the date on which Mr. Patterson first

learned that Dr. Goldsmith had agreed to serve as an expert witness for Michael Paul.

19. Dr. Goldsmith was contacted by Michael Paul's attorneys on September 14, 1987. During that telephone conversation, Dr. Goldsmith was advised generally of the nature of the case, the nature of the injury, and the product involved, and he agreed to serve as an expert witness. He did tell plaintiff's counsel that he had discussed baseball helmet testing and baseball injuries with Mr. Patterson, but did not believe that such discussions would prevent him from serving as an expert on behalf of Michael Paul. The following day, Michael Paul's counsel sent Dr. Goldsmith an extensive package of information concerning this case together with a $1000.00 check which Dr. Goldsmith had requested as a retainer. Dr. Goldsmith did not tell Mr. Patterson that the plaintiffs had retained him.

20. It is Dr. Goldsmith's standard practice to request a retainer in advance for each litigated matter in which he serves an expert witness.

21. It is further Dr. Goldsmith's practice, for each litigated matter in which he serves as an expert witness, to indicate on a list of work assignments the fact that he was retained in a litigated matter. His list indicates that he was retained by Rawlings for some purpose in 1987, but the list describes the "case" as "general baseball caps, equipment testing," and describes the disposition of the action as "general consultation."

22. Dr. Goldsmith sent one bill to Rawlings for his work, which, despite a typographical error, relates to the February 12, 1987 meeting. The bill was for $250.00. The bill described the services rendered as "general consultation on baseball helmets."

23. The two pieces of correspondence which Mr. Patterson sent to Dr. Goldsmith bear the words "Re: *Paul v. Rawlings.*"

24. Dr. Goldsmith has prepared an expert's report in this case which concludes that a Rawlings PL 85 helmet which Dr. Goldsmith had tested prior to 1982 was "inadequate to protect the wearer against a wild pitch. . . ." Dr. Goldsmith further con-

cluded that the PL 85 helmet was in every way mechanically equivalent to the PL 80 helmet allegedly worn by Michael Paul at the time of his injury. He further concluded that methods to improve the performance characteristics of the helmet were known in 1976. Such methods apparently included using one inch-thick padding known as "close-cell foam" similar used to that used in a Bell motorcycle helmet.

25. Dr. Goldsmith performed no new tests in order to prepare his report in this case, but rather relied on the results of testing of both baseball and motorcycle helmets which he had performed prior to writing his article in 1982.

26. Dr. Goldsmith's 1982 article does not specifically indicate that he tested a motorcycle helmet at that time, but does mention certain ANSI standards relating to motorcycle helmets.

27. Dr. Goldsmith and Mr. Patterson did discuss, during one of their conversations, the possibility that in a baseball helmet case, plaintiffs could assert that an alternative design such as the design of a football or motorcycle helmet would be more appropriate to protect a baseball player from a pitched-ball injury.

28. Plaintiffs have paid Dr. Goldsmith almost $6,000 for his services in this case to date.

29. Rawlings has identified a number of other experts relating both to whether the helmet was defectively designed and relating to its third party medical claim. Rawlings has paid several thousand dollars to each of its liability experts.

30. Rawlings has either turned over or agreed to turn over to plaintiffs the results of all tests performed by Dr. Berstein that may have been disclosed to Dr. Goldsmith. Rawlings has not agreed to turn over the results of any tests performed by Mr. Patterson or performed by Rawlings at his direction which were also disclosed to Dr. Goldsmith.

### III. DISCUSSION

This case presents a difficult question concerning the source of the court's power

to disqualify an expert witness and whether the facts of this case justify the exercise of that power. Conceptually, the appropriate questions are: (1) Did Rawlings and Dr. Goldsmith enter into a relationship (whether it rose to the level of a contract for services, or not) which gave rise to an objectively reasonable expectation on Rawlings' part that it could, without risk, impart confidential information to Dr. Goldsmith; (2) Did Rawlings take advantage of its opportunity to disclose confidential information to Dr. Goldsmith; and (3) Is there a showing that Dr. Goldsmith has used or may use such information to Rawlings' disadvantage? If the answer to each of these questions is yes, it must then be determined what remedy, ranging from total disqualification to no action, is appropriate.

There appears to be little case law dealing with the issue of disqualification of expert witnesses. Rawlings has cited only two cases directly addressing the issue. One, *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D.Minn.1986), is not particularly helpful because the parties to that case stipulated that the court should disqualify the expert witness if it found a conflict of interest. According to the opinion of the court, the parties "concur that if [the challenged expert] was indeed engaged as a consulting engineer with plaintiff, on matters relevant to this litigation, at the time it was retained by defendant, that it should be disqualified." *Id.* at 590. Thus, the only question resolved by the court in that case was whether such a conflict of interest existed. The theoretical underpinnings for Rawlings' motion, and for the approach adopted in *Marvin Lumber & Cedar Co.*, are found in the other case cited by Rawlings, *Conforti & Eisele, Inc. v. Division of Building and Construction*, 170 N.J.Super. 64, 405 A.2d 487 (1979).

*Conforti* involved an expert witness who was hired by the defendant to consult on construction claims relating to several phases of a construction project, and who was subsequently hired by the plaintiff with respect to later phases of the same project. The defendant contended that the expert witness should be disqualified. The court concluded that there were two different bases which could be used to order disqualification: the attorney-client privilege, and fundamental fairness.

With respect to the former, the analysis used is largely an extension of existing case law relating to the disqualification of attorneys. According to the *Conforti* court, once an attorney retains an agent to assist the attorney in representing a client, and thereafter discloses privileged matter to the agent, the agent, like the attorney, is precluded from using such confidences to the detriment of the client. The court also concluded that, on grounds of fundamental fairness, a similar result could be reached, stating that if one party to litigation pays an expert for the time spent in developing specific knowledge or expertise with respect to the issues involved in the case, the opposing party should be prevented from reaping the benefits of that work, in much the same fashion as the disclosure of trade secrets is enjoined.

*Conforti* did not simply imply a duty not to disclose information whenever an expert is hired by both parties to litigation to act as an expert with respect to the same issues. Although the expert in question had not been retained by the defendant with respect to the phases of construction covered by his agreement with the plaintiff, the court stated that "the law will imply a relationship of confidence when it is just to do so." Finding that the expert had reasonable access to the defendant's privileged communications and strategies which would cause prejudice to the defendant if disclosed to the plaintiff, the court barred the expert from serving as a consultant even on the later phases of the construction project about which no expert-client relationship had previously existed.

■ The first question to be resolved is whether this court has the power to disqualify an expert witness under any set of circumstances, or based upon the application of any particular legal theory. I am convinced that the court does have such power, both for the purpose of protecting various privileges which may be breached

in some fashion if an expert is permitted to change sides during litigation, *see Miles v. Farrell*, 549 F.Supp. 82 (N.D.Ill.1982), or as part of the court's inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings. *See Williams v. TWA, Inc.*, 588 F.Supp. 1037 (W.D.Mo.1984). The decisional rules set forth in *Conforti* simply represent the application of the court's inherent power both to a specific type of privileged communication—in that case, the attorney-client privilege—and the use of the court's inherent power to preserve the integrity of proceedings before it, under the label of determining whether it is "fundamentally unfair" to permit an expert witness, under certain circumstances, to switch sides.

■ The parties here have focused largely on whether Dr. Goldsmith was retained by Rawlings as an expert witness in the *Michael Paul* case. Although there is much to be said for the application of "bright-line" rules in matters of this sort, the case law does not support, and I will not apply, a "bright-line" rules which would make the question of disqualification turn exclusively on the determination of whether a contractual relationship existed between Rawlings and Dr. Goldsmith. In my view, such a rule would prove both too little and too much. Under certain circumstances, it might be reasonable for an attorney or his principal to communicate privileged or confidential matters to an expert witness even in the absence of a formal contractual relationship. On the other hand, there may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification. Consequently, I believe the proper focus in such situations is to determine, first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.

Stating each proposition negatively, if any disclosures of privileged or confidential material were undertaken without a reasonable expectation that they would be so maintained (so that, in effect, any confidentiality or privilege relating to the matters communicated was waived), or if, despite the existence of a relationship conducive to such disclosures, no disclosures of any significance were made, it would seem inappropriate for the court to dictate to the expert or his new employer that his participation in the case be limited or eliminated.

■ Applying that analysis to the facts of this case, I believe it is a close question as to whether Mr. Patterson or Rawlings, on the one hand, and Dr. Goldsmith, on the other, had a relationship which permitted Mr. Patterson reasonably to expect that any confidential communications concerning the *Michael Paul* case would be maintained in confidence by Dr. Goldsmith. According to Dr. Goldsmith's testimony, his conversations with Mr. Patterson were almost exclusively devoted to the question of setting up a testing laboratory to do research and development-type activities on behalf of Rawlings. Any mention of the specifics of the *Michael Paul* case was not in furtherance of a previous agreement that Dr. Goldsmith would be a witness for Rawlings in this case, but rather reflected Mr. Patterson's general curiosity about an injury involved in a litigated matter that Dr. Goldsmith might, at some time, be asked to become involved in. I do not fully credit this version of the character of the relationship and communications between Dr. Goldsmith and Mr. Patterson. Mr. Patterson appeared to have a more specific recollection of the various conversations, and the fact that the parties discussed specific testing being done by Dr. Berstein and also corresponded concerning that matter indicates that more of the conversations focused on the *Michael Paul* case than Dr. Goldsmith now recalls. I do find, however, that the primary purpose and focus of the communications between Mr. Patterson and Dr. Goldsmith did relate to whether Dr. Goldsmith would be equipped by Rawlings to run tests on baseball helmets, and

that discussion of any specific matters relating to the *Michael Paul* case were secondary.

Notwithstanding the secondary nature of those communications, I believe that the parties had established a sufficiently significant relationship with respect to the overall question of the safety, design, and testing of baseball helmets that, had any disclosures of confidential or privileged information been made, Rawlings could claim a reasonable expectation that the substance of such communications should not be used to its detriment in this case. From the testimony presented at the hearing, and from my own experience, it is evident that there is no "right" way for an attorney to retain an expert for purposes of litigation. While a formal, written contract establishing both the existence of the relationship and prohibiting the disclosure of any information gained by the expert during the course of the relationship would be an ideal way to eliminate questions of the sort which have arisen in this case, neither lawyers nor experts always, or even often, go to such lengths. Of the two participants in an attorney-expert relationship, however, the attorney, being an expert in legal matters, should be more aware both of the potential for privileged information to pass to the expert, and for the need to insure against such information finding its way into the hands of an adversary. Consequently, I do not think it unfair to place the burden of making sure that the expert understands the type of relationship which exists, and the need to keep information disclosed during the course of that relationship confidential, on the attorney in the first instance.

Here, Mr. Patterson apparently believed that by January 28, 1987, the second time he spoke with Dr. Goldsmith after considering him as an expert in the *Michael Paul* case, he had retained Dr. Goldsmith for that specific purpose. It is obvious that the import of that telephone conversation was lost upon Dr. Goldsmith. It is equally obvious that, if the relationship began at that time, Mr. Patterson did little thereafter to reinforce the idea that Dr. Goldsmith would be serving as an expert in a litigated matter. He talked to Dr. Goldsmith primarily about a different subject; he never gave Dr. Goldsmith any written information concerning the *Michael Paul* case; and he never clearly differentiated the litigation-related task of critiquing Rawlings' or Dr. Berstein's testing of baseball helmets from the non-litigation-related assignment of having Dr. Goldsmith set up his own testing laboratory. Further, after the prospect of that latter assignment vanished, and even after the subject of expert witnesses was addressed by this court and dates for the disclosure of such experts were established, Mr. Patterson did not tell Dr. Goldsmith that he would not be selected to do testing of baseball helmets or that Rawlings had a continuing interest in using him as an expert in the *Michael Paul* case.

I am not suggesting that Mr. Patterson did anything wrong in the way in which he established his relationship with Dr. Goldsmith, or did anything detrimental to his client's interests (unless his client's interest was solely to prevent Dr. Goldsmith from becoming the plaintiffs' expert). Rather, however, it is my conclusion that the relationship between parties as it related specifically to Dr. Goldsmith's being an expert witness for Rawlings in the *Michael Paul* case was a very tenuous one, in large part because the parties never communicated on matters of particular substance relating to the *Michael Paul* case.

There is a certain circularity in the method of analysis I follow here. Had Mr. Patterson made significant disclosures to Dr. Goldsmith concerning the *Michael Paul* case, I would deem the relationship between the two to be worthy of more significant protection. One of the reasons I conclude the relationship between the two was not particularly strong as it relates to the *Michael Paul* case is the lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. This circularity, however, reflects the fact that it is the nature of the communications between an attorney and an expert, and the extent to which both

parties appreciate the significance or confidentiality of those communications, which is the crucial focus of the court's inquiry into whether the expert should later be disqualified from serving on behalf of the other party.

Using the nature of the communications between Mr. Patterson and Dr. Goldsmith as the focus of this analysis, I conclude that there is little reason to direct that Dr. Goldsmith be disqualified in any way from serving as an expert on behalf of plaintiffs. Of the communications specific to the *Michael Paul* case which were disclosed at the hearing, the great majority of them consisted of advice given by Dr. Goldsmith to Mr. Patterson. That advice, in turn, appears to have drawn on Dr. Goldsmith's previous testing of baseball helmets. To the extent that Dr. Goldsmith may now have given the same advice to plaintiffs, there is nothing unfair in permitting him to do so. He did not develop any expertise in the area of testing baseball helmets, nor derive any of those specific ideas, from work done under Rawlings' direction or using its funds. Dr. Goldsmith appears neither to have made use of, nor to be in possession of, any information which could be classified as a trade secret or deserving of protection on the same type of theory.

With respect to information communicated by Mr. Patterson to Dr. Goldsmith, Mr. Patterson was, understandably, reluctant to describe any such information in specific terms, especially to the extent that he considered it to be covered by a privilege which would otherwise prevent plaintiffs from obtaining the same information. I cannot conclude, even from the general nature of the testimony presented, that any attorney-client communications were revealed by Mr. Patterson. His claim focused more on the work product privilege, and he was specifically concerned about having divulged some of his theories of the case to Dr. Goldsmith. Such discussions, however, did not appear to extend to Rawlings' theories, but rather to Mr. Patterson's attempt to anticipate what plaintiffs' theories would be, and particularly whether they intended to make a comparison of the design of a baseball helmet with the design of other existing helmets which might have been more effective in preventing the injury in question. I specifically find that Dr. Goldsmith was well aware, from his previous work, that a baseball helmet could be compared to other types of helmets on the market at the time of manufacture, and that such a comparison might prove fruitful in determining whether that baseball helmet could have been better designed. In fact, that point seems an obvious one. Consequently, I attach little significance to the fact that Dr. Goldsmith's report to plaintiffs makes a comparison between baseball helmets and a specific motorcycle helmet. Further, as Rawlings acknowledged at the hearing, now that Dr. Goldsmith has drawn that comparison, even if he were to be disqualified, another expert, to the extent that he possessed the requisite expertise to do so, could make a similar comparison.

The foregoing suggests that, although Rawlings may have created an opportunity to confide in Dr. Goldsmith in such a way that he would thereafter be precluded from working for the plaintiffs in this case, Rawlings did little, if anything, to take advantage of that opportunity. In turn, I see no evidence that the plaintiffs have been unduly advantaged, or Rawlings unduly disadvantaged, by the fact that Dr. Goldsmith had a relationship and communications with Rawlings and Mr. Patterson. Rather, I find it likely that Dr. Goldsmith would have produced the same report and drawn the same conclusions, even if he had never spoken to Mr. Patterson. I believe this total absence of demonstrable prejudice to Rawlings is a very important factor in determining that Dr. Goldsmith ought not to be disqualified.

Rawlings has suggested, however, in keeping with a number of the attorney-client privilege cases cited by other courts in this context, that once the existence of a confidential relationship is established, a presumption that confidential communications were made, and that such communications would then be used to the detriment of the communicating party, arises. That presumption is important in the attorney-

client area for at least two reasons. First, it eliminates the need for the client to demonstrate that potentially prejudicial information passed between him and his attorney by testifying to such information, which, of course, would then defeat the claim of privilege. It also is designed to preserve the public trust in the integrity of the judicial system by preventing an attorney from engaging in the unseemly practice of representing different parties to the same litigation at different times. I find each of these reasons less persuasive in the case of an expert witness, because there are many communications between a client and expert witness which are not privileged, and because there is less stigma attached to an expert "changing sides" in the midst of litigation than an attorney, who occupies a position of higher trust, with concomitant fiduciary duties, to a client than does an expert consultant. Even if I were to indulge in the presumption in this case, and therefore assume that additional matters covered by the work product privilege were communicated by Mr. Patterson to Dr. Goldsmith, the fact that none of those matters appears to have leaked into Dr. Goldsmith's report or appears to have affected in any significant way his conclusions about the matter at issue persuades me that any such presumption has been overcome by the specific facts of this case.

Rawlings suggested at the hearing, without elaboration, that there are significant differences between Dr. Goldsmith's expert report in this case and his previous article, and that Rawlings may well be able to demonstrate at trial that Dr. Goldsmith has changed his opinion because of information he learned from Mr. Patterson concerning weaknesses in any anticipated claim by the plaintiffs that a baseball helmet should have been designed more like a motorcycle helmet. There is simply not enough information in this record for me to reach that conclusion. Further, if Rawlings can substantiate that claim at trial, Rawlings may be able to discredit Dr. Goldsmith's testimony. By indicating that he should not be disqualified as an expert witness, I do not mean to imply that the circumstances of his relationship with Rawlings, or the impact of that relationship upon his opinions in this case, cannot be the subject of questioning at the trial if the trial judge believes such inquiries to be pertinent.

I recognize that any decision in this area has the potential to affect the way in which attorneys and expert witnesses typically handle their affairs. I believe that the ability of an attorney to communicate effectively with an expert witness either for the purpose of determining whether the expert wishes to be employed, or for the purpose of obtaining the expert's advice, is a matter deserving of court protection. There may well be cases in which the attorney-expert relationship with respect to a particular litigated matter is so strongly established through proof of the existence of a formal and well-defined relationship, and through proof of substantial work performed by the expert relating to the case, that no testimony as to the nature of the communications between the two is necessary in order for the court to conclude that, in all fairness, the expert should not serve in any capacity for the opposing side. Just as clearly, there are cases where the contact between the attorney is expert is so minimal that to prevent the expert from serving for the opposing side would be an injustice both to the opposing party and to the expert. This case falls much closer to the latter end of the spectrum than to the former. The relationship between Rawlings and Dr. Goldsmith was both attenuated and informal, involved very little in the way of specific tasks or work product, and involved very little in the way of privileged or confidential communications. Further, Dr. Goldsmith, based upon his past work and publications, appears more logically to be a plaintiff's expert than a defendant's expert in this type of case. While not attributing to Rawlings any intent to retain Dr. Goldsmith primarily for the purpose of making him unavailable to the plaintiffs, as opposed to utilizing his services in an affirmative fashion in the defense of this lawsuit, I also recognize that if experts are too easily the subject of motions to disqualify, unscrupulous attorneys or clients will

be encouraged to engage in a race for expert witnesses, and to identify potentially harmful experts and to create some type of inexpensive relationship with those experts, simply in order to keep them away from the other side. Obviously, given all of these important concerns, it is the court's function to make a reasoned inquiry, to balance the competing policy objectives, and to reach a decision in each case which is the most consistent with promoting these policies as well as doing justice in the individual case. I have attempted to do so in this case, and, based upon the matters articulated in this opinion and order, conclude that on the basis of the record before me, Dr. Goldsmith should continue to serve as plaintiffs' expert.

 Having so concluded, it appears to me that the plaintiffs' request for production of the tape-recorded conversations between Mr. Patterson and Dr. Goldsmith is largely moot. To the extent that plaintiffs have any continuing interest in those documents, I conclude that Rawlings' act of requesting a protective order when the matters were submitted under seal, and the fact that I did not consider any of the material contained in the tapes or transcripts in reaching a decision on this issue, negates any claim of waiver. Therefore, the motion to produce such documents will be denied. It should further be noted that docket entry no. 90, which reflects receipt of the materials under seal, no longer reflects the actual state of the court's file because those materials have been returned to Rawlings' counsel.

Based upon the foregoing, it is ordered that:

1. Rawlings' motion to disqualify Dr. Werner Goldsmith as an expert witness on behalf of plaintiffs is denied.

2. Plaintiffs' motion for the production of tape recordings and transcripts of conversations between Dr. Goldsmith and Daniel Patterson is denied.

3. In accordance with discussions off the record following the evidentiary hearing on this matter, the parties are directed to confer in good faith in an attempt to determine how much additional time is reasonably necessary to complete discovery, and to propose, by way of a joint status report to be filed no later than 30 days from the date of this order, a revised discovery schedule for the completion of all discovery.

Any party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. § 636(b)(1)(A), Rule 72(a), Fed.R.Civ.P.; Eastern Division Order No. 85–4, pt. I., C., 2. The motion must specifically designate the order or part in question and the basis for any objection. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.