**Edgar STENCEL, Plaintiff,**

v.

**The FAIRCHILD CORPORATION, Defendant.**

**The Fairchild Corporation, Counter-claimants,**

v.

**Edgar Stencel, et al., Counter-defendants.**

**No. 99–10572(GAF)(AWJX).**

United States District Court, C.D. California.

Nov. 28, 2001.

Robert W. Clemmer, Robert W. Clemmers Law offices, Orange, CA, for plaintiff.

C. Forrest Bannan, Jemal K. Yarbrough, Bannan Green Frank & Terzian, Los Angeles, CA, for defendants.

## ORDER RE: PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT'S EXPERT

FEESS, District Judge.

## I.

## INTRODUCTION

The motion before this Court involves efforts by both parties to obtain an expert witness from the same law firm. Some months ago. Plaintiff approached one member of the Knobbe, Manens, Olson & Sear ("KMOB") firm, Craig Summers, to testify as a patent expert. Mr. Summers tentatively agreed to accept the retention, but ultimately withdrew when he discovered a conflict that would prevent him from testifying against Defendant. Later, Defendant retained a different KMOB partner. Thomas Smegal, from a different office of that firm, to testify as a patent expert. Mr. Smegal accepted the assignment and plans to testify for defendant. Plaintiff objects and now moves this Court to create, in essence, a strict imputed disqualification rule for expert witnesses akin to that which applies to attorneys. Because the issues presented in cases involving alleged conflicts of interest where attorneys testify as witnesses do not raise the same concerns that are present when the conflicts involve prior legal representation, the Court declines Plaintiff's invitation. Having considered the facts and circumstances of the alleged conflict in this case, the motion to disqualify is hereby **DENIED**.

## II.

## FACTUAL BACKGROUND

### A. THE UNDERLYING CASE [1]

This action is brought by Plaintiff Edgar Stencel ("Plaintiff" or "Stencel") for payments due from Defendant, the Fairchild Corporation ("Defendant" or "Fairchild"), pursuant to the provisions of a Technical Consulting Agreement. Under that agreement, Stencel promised to provide Fairchild with consulting services in connection with the manufacture and production of his invention, the "Eddie–Bolt" system, in exchange for Fairchild's agreement to pay Stencel one-half of one percent of the "Eddie Bolt" worldwide net sales.

Stencel alleges that his payments stopped in 1996, when Fairchild claimed that (1) Stencel had not been providing consulting services, (2) the contract was void for lack of consideration, and (3) the "Eddie–Bolt" system was not viable. Defendant further asserts that the "Eddie–Bolt–2" system now sold by Fairchild does not fall under the Technical Consulting Agreement, because of material differences between the original and the revised "Eddie–Bolt" systems.

As this case involves patents, the parties have sought the assistance of expert witnesses regarding the technical and legal issues relating to the devices in issue. The present dispute has arisen out of that effort.

### B. PLAINTIFF'S DEALINGS WITH SUMMERS [2]

In his effort to locate an expert witness, Plaintiff's counsel, Robert W. Clemmer, first contacted Craig Summers, a partner at KMOB's Newport Beach Office on March 12, 2000. The parties were identi-

---

**1.** *See generally,* Pl.'s Memo, Points, and Auth., p. 3.

**2.** *See generally,* Clemmer Decl. ¶¶ 3–5.

fied and the claims were explained in sufficient detail to allow Summers to conduct a conflicts check. After the check was completed, Summers responded that, because his inquiry had disclosed no conflict, he would be willing to serve as a consultant and possibly an expert witness. The facts of the case, the contentions of the parties, and Clemmer's impressions and opinions of the Defendant's allegations were discussed. Clemmer also sent Summers the Complaint, the Technical Consulting Agreement, the Answer, Defendant's First Amended Counterclaim, and Plaintiff's answer thereto.

To document the arrangement, Summers sent a Retainer Agreement to Clemmer, which Stencel signed but did not return. The retainer provided:

> This letter will confirm the Engagement of Craig S. Summers ... as a consultant and a potential testifying patent expert in the case of Stencel v. The Fairchild Corporation ... pending in the U.S. District Court for the Central District of California.
>
> .    .    .    .    .
>
> Expert agrees that neither he nor his firm will accept employment adverse to Party, now or in the future, directly relating to the Subject of Engagement, without the prior written consent of the [Plaintiff].

Notwithstanding the above, on June 15, 2000, Summers revealed that he did in fact have a conflict, through a previous employer, and he thereafter declined further consultation with Plaintiff.

## C. DEFENDANT'S DEALINGS WITH SMEGAL [3]

A few months later, Defendant's counsel sought to engage Thomas Smegal, of KMOB's San Francisco office, as an expert in this case.[4] Prior to his engagement, Smegal conducted a conflicts check which revealed Summers' previous interaction with Plaintiff. After consulting with KMOB's Conflicts Committee and with Summers,[5] Smegal accepted Defendant's request that he serve as consultant and expert witness. In due course, the matter came to the attention of plaintiff who responded with this motion.

## III.

## ANALYSIS

### A. STANDARD FOR DISQUALIFICATION OF EXPERT WITNESSES

██ Courts have inherent power to disqualify experts. *Advanced Cardiovascular Systems, Inc. v. Medtronic Inc.* 1998 WL 230981 *1 (N.D.Cal.1996); *Koch Refining Co. v. Jennifer L. Boudreaux MV,* 85 F.3d 1178, 1181 (5th Cir.1996). This power is conferred on the Court "both for the purpose of protecting various privileges which may be breached in some fashion if an expert is permitted to change sides during the litigation, or as part of the court's inherent power to preserve the fairness and integrity of judicial proceed-

---

**3.** *See generally,* Smegal Decl. ¶¶ 3:17–19, 7:12–16, 3:21–28.

**4.** There is no evidence that Defendant acted in bad faith or attempted to gain illicit access to Plaintiff's confidential information where it contacted Smegal. Indeed, it appears that Defendant contacted Smegal only because Defendant was unable to utilize the services of a previously retained expert.

**5.** Smegal's conversations with Summers did not include any confidential information. Summers only told Smegal that he (Summers) had been contacted by Clemmer to serve as an expert witness, that Clemmer had provided certain pleadings to Summers, and that Clemmer eventually withdrew his offer to retain Summers as an expert. (*See* Summers Supp., Decl. ¶¶ 2–5 *and* Smegal Supl. Decl. ¶¶ 2–4).

ings." *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988) (citations omitted).

■ Courts undertake a two step inquiry in resolving motions to disqualify an expert based on a prior relationship with a party. *Paul*, 123 F.R.D. at 278; *English Feedlot Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498, 1502 (D.Col.1993). The burden of proof is on the party seeking disqualification to establish that both elements of the disqualification test have been established. 833 F.Supp. at 1501–02

■ First the moving party must prove that it was objectively reasonable for the it to believe that a confidential relationship existed. *Paul*, 123 F.R.D. at 278. Thus, the existence (or absence) of a contract between the parties is not determinative. *Id.* This inquiry rests on factors such as whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial.[6] *Koch*, 85 F.3d at 1182.

Second, the moving party must establish that it in fact disclosed confidential information to the expert. *Paul*, 123 F.R.D. at 278; *English Feedlot*, 833 F.Supp. at 1502. Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged. *Paul*, 123 F.R.D. at 281. Courts are more likely to find for the moving party if any of the following information is shared: legal strategies, the types of experts to be called, the attorney's views on the relative

strengths or merits of a claim or defense, the role of other witnesses at trial or anticipated defenses. *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir.1996).

In addition to this two pronged inquiry, some courts also examine the competing policy objectives inherent in disqualifying experts. *Feedlot*, 833 F.Supp. at 1502; *Paul*, 123 F.R.D. at 281–82. This inquiry obviously overlaps with the above, since all courts have an interest in preventing conflicts of interest and thereby preserving the integrity of the justice system. Nevertheless, there are additional policy considerations which favor allowing experts to pursue their trade and allowing parties to select their own experts. *Id.* If experts are too easily disqualified, unscrupulous attorneys may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance. *Paul*, 123 F.R.D. at 281–82. The concerns must be balanced against any prejudice that might occur, under the facts of the case, if an expert is not disqualified.

**B. THE FIRST INQUIRY: REASONABLE EXPECTATIONS OF THE PARTIES**

■ The burden rests on Plaintiff to show that he had an objectively reasonable expectation that a confidential relationship existed. On that question, the evidence is somewhat in conflict.

Plaintiff's evidence indicates that Clemmer and Summers agreed to the latter's retention as an expert witness and consultant prior to the delivery of the Retainer Agreement. In addition, Clemmer sent documents to Summers for review, presumably to commence work on behalf

6. Some courts also look to whether there was an exchange of confidential information to determine this inquiry. *See, e.g., Paul,* 123 F.R.D. at 279. Since the second inquiry relates to the character of the information exchanged, engaging in such an inquiry here is repetitive, if not circular.

of the plaintiff, Clemmer also asserts that he disclosed certain of this thought processes to Summers during their conversations. Moreover, Summers was retained as a consultant for the present, and only potentially as an expert witness in the future, which supports Plaintiff's claim of confidential relationship, since it would not be until Summers was named as a witness that Rule 24(a)(2)(B) would come into play. Only the opinions of expert *witnesses* are subject to Rule 24 disclosures, and fairness would require allowing the Plaintiff to determine when an expert becomes a witness and thus when the bases for its experts' opinion become public. On the other hand, since the evidence also shows that Clemmer contemplated using Summers as a testifying expert this undermines Plaintiff's claim of a confidential relationship, since testifying experts must reveal the underlying sources relied upon in reaching their conclusions at deposition and on cross examination. Fed.R.Civ.P. 24(a)(2)(B). Thus, counsel must have contemplated at least the possibility that information that he communicated to Summers would be revealed if Summers rendered an opinion that counsel wished to use at trial.

Taken as a whole, the fact that Summers was originally to act as a consulting expert, that Plaintiff would share information with Summers, who would in turn share his conclusions with Plaintiff, and that only after discussion and assessment would Summers be designated (if at all) as a testifying expert, indicate that Plaintiff's expectation of confidentiality was reasonable. In addition, although the parties did

not have the opportunity to develop a relationship of longstanding and frequent contact, it certainly was contemplated that they would do so. Also, the exchange of the Retainer Agreement, though not finalized, is persuasive evidence that Clemmer could reasonably rely on Summers to preserve the confidentiality of any statements made, since the Agreement itself indicates that understanding between the parties.[7] Finally, the fact that any research or resulting conclusions that Summers made would be paid for by Plaintiff also supports an objectively reasonable expectation of confidentiality.

## C. THE SECOND INQUIRY: COMMUNICATION OF CONFIDENTIAL INFORMATION

The burden rests on Plaintiff to show that he or his attorney communicated confidential information to Summers. Plaintiff's evidence indicates that Clemmer provided Summers with a copy of each of the pleadings thus far filed in the instant case. Those documents cannot be confidential information, since, as Defendant rightfully points out, they are public record.

However, Clemmer also declares that he shared his "opinions and impressions regarding [Defendant's] belated excuse for not making payments to Stencel." (Clemmer Decl. ¶ 3). Clearly these communications are not privileged attorney-client communications, Insofar as they are not communications between the attorney and the client. However, these communications are work product, since they reflect his mental impressions developed in anticipation of trial.[8] Thus, Plaintiff has estab-

---

7. The parties dispute whether this Letter is evidence of an underlying contract, or is instead an offer by Summers. The distinction is immaterial for the current analysis because in any event it reveals the intent of the parties.

8. The "work product" doctrine protects trial preparation materials that "reveal an attor-

ney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews." *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The purpose of this protection is to prevent attorneys from "borrowing the wits of their adversaries." *Id.* Work product includes "documents and tangible things

lished that at least some confidential information was disclosed to Summers in their early conversations.

## D. THIRD INQUIRY: PREJUDICE TO THE PARTIES

The court must also balance the additional competing policy objectives cited above with respect to disqualification of experts. While Defendant asserts an undue hardship if it is obligated to find a new expert, it concedes that such an endeavor is not impossible. (Opp. p. 9 IL 15–16). However, Defendant estimates that it will require an additional two months to find an alternate expert and for that expert to achieve the same level of familiarity with the case that Smegal currently has.

At the same time, Plaintiff has not clearly asserted any prejudice it might suffer from Smegal's retention as expert. While it may seam obvious that disclosures of attorney work product to Summers would prejudice Plaintiff it Summers was Defendant's expert, the fact is that Defendant has not hired Summers. Plaintiff avoids addressing the obvious fact that Summers and Smegal are not the same person and instead, seems to implicitly rely upon a theory of imputed disqualification. (*See* Pl.'s Memo. Points and Auth. p. 9, IL 17–27).

Under plaintiff's approach, such a doctrine operates in the same manner as imputed disqualification operates for attorneys in their capacity as legal counsel. Thus, when a single expert within a firm (e.g., Summers) is disqualified, the doc-

trine would require that his firm and all attorneys in it should likewise be disqualified.[9] Since Plaintiff cites no case law for this proposition, and the Court has found none, the Court examines whether such a doctrine should operate in the expert witness arena.

## E. IMPUTED DISQUALIFICATION DOCTRINE FOR EXPERT WITNESSES

### 1. The Duty of Loyalty

The doctrine of imputed disqualification of attorneys finds its most important roots in the principle of loyalty an attorney must have for his or her client. *See, e.g.,* ABA Model Rules of Professional Conduct 1.10, comment G. The doctrine deems all attorneys in a firm as essentially one lawyer for purposes of loyalty to the client. *Id.* In other words, all attorneys in a firm, whether or not they have worked on matters for a particular client, are bound by the same obligation of loyalty as those who actually perform work for the client. *Id.*

The same considerations do not apply to experts, simply because they perform a very different function in litigation than do lawyers. *See generally EEOC v. Locals 14 and 15,* 1981 WL 163 *1, *4 (S.D.N.Y. 1981). Attorneys are advocates, charged with selflessly serving their client's interests. Expert witnesses, on the other hand, are employed to assist the parties in their pretrial preparation, and if called to testify, to give their unbiased opinion in order to assist the trier of fact in understanding

... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative." *Cf.* Fed. R.Civ.P. 26. The doctrine extends to oral statements as well, so long as they reflect the attorney's mental impressions, opinions, conclusions, judgments or legal theories. *Upjohn v. United States,* 449 U.S. 383, 399, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), *Hickman,* 329 U.S. at 511, 67 S.Ct. 385.

9. Of course, not all or even most experts are attorneys, as in this case. Since the experts are attorneys in this case, the discussion of imputed disqualification is germane to a resolution of the present motion. However, this order should not be read as expressing an opinion regarding the applicability of any sort of imputed disqualification to experts in other fields, such as medicine. engineering or mathematics.

the relevant evidence. *See* Fed.R.Evid. 702.

This distinction is inherent in the very nomenclature that describes the parties. A witness is one who has engaged in the activity of "witnessing," and is called to testify, truthfully and under oath, as to what he observed or what he knows. An expert witness is merely a witness with additional knowledge beyond the ken of the layman, who helps the trier of fact understand scientific, technical or other specialized topics. Fed. R. Evid 702. Should the expert witness choose to mischaracterize or prevaricate in presenting his testimony, he does so at his own peril, since he is subject to cross examination and impeachment. Thus, at least in theory, the expert witness, like all other witnesses, is beholden to the truth first, and the party second, if at all.[10]

In contrast, an advocate is one who engages in the activity of advocating. To advocate does not mean to offer facts; it means to characterize and sculpt the facts. This may involve emphasizing certain facts, drawing attention away from others and keeping confidential additional facts. To the extent the advocate mischaracterizes, omits, or exaggerates, the opposition's recourse is limited to counter-argument, not cross examination. It is argument that is the bailiwick of the advocate, and duty compels her to characterize the facts in the manner best able to assist her client. Thus, the advocate is beholden to her client as much as she is to the truth.

This distinction between the role of expert and role of advocate is reflected in the different protections afforded to attorneys and expert witnesses. Attorneys are generally immune from subpoena and deposition, and are virtually never compelled to reveal their work product. Experts, on the other hand, are subject to deposition, to cross examination, and are obligated to reveal any sources they rely upon in forming their opinion. Fed.R.Civ.P. 26(b)(4). In fact, the only similarity between experts and attorneys is that the parties purchase the services of each. While this relationship should engender some obligations of loyalty,[11] it cannot alone rise to the level of fiduciary obligation.

### 2. The Duty of Confidentiality

A second principle underlying the doctrine of imputed disqualification is the protection of the confidences of a client. This concern is obviously secondary, in light of the widespread adoption of "screens," i.e., procedures and policies that insulate adverse attorneys from other law firm members. Such screens may take the form of "(1) instructions, given to all members of the new firm, of the attorney's recusal and of the ban on exchange of information; (2) prohibited access to the files and other information on the case; (3) locked case files with keys distributed to a select few; (4) secret codes necessary to access pertinent information on electronic hardware; and (5) prohibited sharing in the fees derived from such" representation. *Cromley v. Board of Education,* 17 F.3d 1059 (7th Cir.1994). Proper implementation of these screens can avoid imputed disqualification

---

**10.** Indeed, witnesses can be compelled to testify on behalf of parties they despise; they may likewise act adverse to that party's interests outside the courtroom or may even be opponents of that party in current litigation. Attorneys too can be forced to act on behalf of those they find despicable, such as appointment to represent criminal defendants; however, once an attorney is so appointed, the

attorney owes a duty of loyalty to that client that extends beyond the courtroom and that duty has no less gravity than that owed to the client's who purchase the attorney's services.

**11.** *See* Part III-A *supra.* The Court notes that the jilted party is not, without a remedy against the faithless expert, since the party may pursue a claim in contract.

only with respect to newly hired attorneys who would otherwise disqualify a firm, i.e., "the moving lawyer problem." *See, e.g., id.*

Screening has never been approved for simultaneous representation of two adverse clients by the same law firm. This naturally follows from the fact that clients hire firms, not individual attorneys for representation, while the opposite is true in the expert witness arena.

### 3. *Imputed Disqualification in the Instant case*

In the instant case, the issue is not a conflicted attorney but a conflicted expert. Thus, the concerns of loyalty that in large part drive imputed disqualification are absent. In addition, even though the two experts in this case are both employed by KMOB, a proper screen satisfactorily addresses the policy goal of protecting the confidentiality of Clemmer's work product. This screen need not be as restricting as would be appropriate for a conflicted attorney. Likewise, since expert witnesses are hired as individuals and not through firms, the fact that the screen may serve to separate two experts who work in the same organization does not give the Court pause.

An adequate screen is presented here. Summers and Smegal have had no interactions with each other with respect to this matter apart from disclosing that they both were contacted by the parties in this case. Summers also states that he has not disclosed to Smegal any of the potentially confidential information he received from Clemmer during Clemmer's attempt to retain Summers' services. In addition, Summers works in Newport Beach, California, while Smegal works in KMOB's San Francisco office, over five hundred miles distant. Further, Smegal has declared that he has no direct access to any documents Summers may have drafted in this matter, nor will he have such access in the future. Thus, it appears to the Court that plaintiff has not and will not suffer any unfair prejudice it Smegal is permitted to act as Defendant's expert.

### IV.

### CONCLUSION

The Court finds that Plaintiff had a reasonable expectation that Summers would preserve the confidentiality of his communications and that Clemmer did reveal confidential information to Summers, pursuant to their understanding that such information would remain confidential. However, the fact that Summers would be disqualified is not, in and of itself, sufficient to disqualify all members of KMOB, especially those who are properly screened from any information or documents in Summers' possession. Since no confidential information has been disclosed to Smegal, and steps have been taken to assure that no such information will be disclosed in the future, disqualification of Smegal is unwarranted.

Thus, for the foregoing reasons, the motion is **DENIED.**

IT IS SO ORDERED.