**GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff,**

v.

**HARNISCHFEGER CORPORATION, Defendant.**

**HARNISCHFEGER CORPORATION, Third–Party Plaintiff,**

v.

**FAG BEARINGS CORPORATION, Fag Kugelfischer Georg Schafer, and General Electric Corporation, Third–Party Defendants.**

**No. 89 C 1971.**

United States District Court, N.D. Illinois, E.D.

April 10, 1990.

Michael A. Pope, Jan Feldman and Karen G. Seimetz, Phelan, Pope & John, Ltd., Chicago, Ill., for Great Lakes Dredge & Dock Co.

Robert W. Hallock, Edward R. Gower and Victoria P. Pappas, Keck, Mahin & Cate, Chicago, Ill., for Harnischfeger Corp.

George N. Vurdelja, Jr., William A. Gordon and Alan J. Martin, Mayer Brown & Platt, Chicago, Ill., for General Elec. Corp.

Thomas M. Sheehan, Robert D. Kolar and John R. Fanone, Robert D. Kolar & Assoc., Ltd., Chicago, Ill., for FAG Bearings Corp. and FAG Kugelfischer Georg Schafer.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

This matter comes before the court on plaintiff's, Great Lakes Dredge & Dock Company (Great Lakes), motion to bar Mr. John Rumbarger and Franklin Research Center from acting as a consultant or testifying experts for the third-party defendant, FAG Bearings Corporation (FAG). Plaintiff contends that a conflict of interest exists if Mr. Rumbarger is allowed to be retained by FAG, because Mr. Rumbarger works for the same company as plaintiff's expert, Dr. Leonard, and Mr. Rumbarger often supervises Dr. Leonard's work. The facts are not as simple and the issue is not as clear as plaintiff contends. A discussion of the facts concerning the relationship between Mr. Rumbarger and Dr. Leonard as well as the retention of these two experts is a prerequisite to the understanding of the issue involved.

*Background*

Plaintiff, Great Lakes, agreed to purchase a large waterway dredge from defendant, Harnischfeger, in 1985. The dredge christened the "Chicago" was delivered in 1987. The Chicago consists of a 220–foot floating barge upon which is fixed a combination mining shovel and clamshell which digs bottom sediment from waterways. The mining structure rotates or swivels on an eighteen-foot "slewing" ring bearing. This slewing bearing was manufactured and sold to defendant, Harnischfeger, by the third-party defendant, FAG.

Shortly after the Chicago was delivered to Great Lakes, the bearing seized and the dredge became inoperable. Efforts by Great Lakes to obtain necessary repairs

from Harnischfeger were unsuccessful. In 1987, Great Lakes retained John E. Sague and Associates (Sague and Associates) of Philadelphia to determine the cause of the slewing bearing failure and to recommend remedial steps necessary to return the Chicago to an operational condition.

Sague and Associates employed Dr. Leonard, an expert in the field of metallurgy, to be a consultant on the Great Lakes dredge problem. As a consultant to Sague and Associates, Dr. Leonard investigated the cause of the bearing failure, conducted tests and submitted a technical report containing his findings and conclusions on the cause of the bearing's failure. Based upon this report, Great Lakes expended substantial sums in modifying the bearing to enable the Chicago to operate on a temporary basis. Ultimately, over the course of time, Great Lakes arranged to have a new bearing designed and manufactured and installed in December 1989. Dr. Leonard consulted on the repairs of the original bearing as well as the design of the replacement bearing. Great Lakes filed the instant action against Harnischfeger in 1989. Since Great Lakes filed suit, Dr. Leonard has discussed his findings with counsel for Great Lakes. Great Lakes intends to call Dr. Leonard as an expert at trial.

Defendant, Harnischfeger, filed a third-party complaint for contribution against FAG, alleging defects in the FAG bearing incorporated into the Chicago caused Great Lakes' damages. In December 1989, FAG retained Franklin Research Center (Franklin) and its Executive Engineer, Mr. John Rumbarger, to act as its outside expert on the bearing failure issue. Mr. Rumbarger is a mechanical engineer. Mr. Rumbarger has worked at Franklin for approximately 25 years.

Dr. Leonard's professional pursuits are not limited to consulting for Sague and Associates. Dr. Leonard is also employed as a Principal Engineer in the Engineering Department of Franklin. The Engineering Department has worked on numerous matters involving bearing failures, including failures of bearings the size of the bearing involved in the Chicago. In many of these matters, Mr. Rumbarger and Dr. Leonard worked together. Currently, Mr. Rumbarger supervises Dr. Leonard on any project upon which Mr. Rumbarger is project leader. The members of the Engineering Department at Franklin occupy a discrete portion of the facility and use the same secretarial, filing, computer and support facilities. The members of the department often discuss ongoing projects on a formal and informal basis.

### Discussion

Plaintiff, Great Lakes, filed a motion seeking to bar Mr. Rumbarger and Franklin Research Center from acting as consulting or testifying experts for FAG. Great Lakes attached the affidavit of Dr. Leonard in support of its motion. FAG filed its response which included the affidavit of Mr. Rumbarger. The affidavits are consistent in that there is no conflict in their statements over the nature of the hiring of the two experts or their relationship at Franklin Research Center.

Great Lakes contends that the fact Mr. Rumbarger and Dr. Leonard are both employed at Franklin and that Mr. Rumbarger often supervises Dr. Leonard when they work at Franklin on bearing failures, creates an intolerable conflict of interest which requires this court to disqualify Mr. Rumbarger and Franklin as experts for FAG. FAG counters that Great Lakes' use of Dr. Leonard was through his employment with Sague and Associates and unconnected to his work for Franklin with Mr. Rumbarger. FAG argues that Great Lakes has never consulted or retained Mr. Rumbarger or Franklin on the issues involved in the bearing failure at issue. The fact that Dr. Leonard worked at Franklin was not included in Dr. Leonard's resume submitted to FAG. FAG did not know of the common employer problem until informed by Great Lakes. FAG argues that Mr. Rumbarger's and Dr. Leonard's specialties are in different fields and there is no risk of prejudice to Great Lakes because no confidential or privilege information of Great Lakes is at risk and no conflict of interest exists. FAG argues it would be prejudiced if denied the use of its chosen

expert, an acknowledged expert in the field of slewing bearing failures.

As both parties have stated in their briefs, there is a paucity of case law on the subject of disqualifying expert witnesses when conflicts of interest arise. Several courts have tackled the issue and the court finds one of these cases to be particularly helpful in analyzing the problem presented in the instant case. *See Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271 (S.D. Ohio 1988).

The court in *Paul v. Rawlings Sporting Goods Co.* began its analysis by addressing the issue of what power, if any, a court has to disqualify a party's expert under any circumstances. 123 F.R.D. 271 (S.D.Ohio 1988). The court found that it was within a court's inherent power to grant necessary relief in order to protect various privileges which may be breached in some fashion if an expert with a relationship to one party were permitted to testify for that party's adversary. *Paul*, 123 F.R.D. at 278; *see Miles v. Farrell*, 549 F.Supp. 82 (N.D.Ill. 1982) (barred continued retention or testimony by treating physician of plaintiff who was retained by defendant as expert while still treating plaintiff). Additionally, the court found that it was within the inherent power of the court to disqualify an expert if necessary to preserve the public confidence in the fairness and integrity of the judicial proceedings. *Paul*, 123 F.R.D. at 278. In reaching its conclusion, the court in *Paul* discussed *Conforti & Eisele, Inc. v. Division of Building and Construction, et al.*, 170 N.J.Super. 64, 405 A.2d 487 (1979).

In *Conforti*, the court relying on its inherent power to protect a client's attorney-client privilege and fundamental fairness, extended the attorney-client privilege which protects confidential communications made to an attorney by the client, to confidential client communications made to an agent of the attorney by the attorney. *Conforti*, 170 N.J.Super. 64, 405 A.2d 487 (1987). The *Conforti* court was protecting the defendants from the risk of prejudice from possible disclosure and use of confidential client communications which arose

when the plaintiff hired the former expert of the defendants' attorney who had been exposed to and received confidential client materials involving the pending litigation while being employed in a related litigation matter by the defendants' attorney. *Conforti*, 170 N.J.Super. 64, 405 A.2d 487. The *Paul* court categorized *Conforti* as a particular application of a court's inherent power to protect various privileges, i.e., attorney-client. *Paul*, 123 F.R.D. at 278. The *Paul* court interpreted the language of *Conforti* involving fundamental fairness in not allowing an expert witness to switch sides in the same or related litigation as being an application of a court's inherent power to preserve the integrity of proceedings before the court. *Paul*, 123 F.R.D. at 278. The court in *Paul* read *Conforti* to stand for the idea that in certain circumstances it would be fundamentally unfair to allow an expert hired by a party, who at that party's expense obtains specific knowledge and expertise in the issues involved in the litigation, to then be hired by the opposing party and allow the opposing party to reap the benefits of that work, in much the same fashion as disclosure of trade secrets. *Paul*, 123 F.R.D. at 277.

The court in *Paul*, however, rejected a "bright line" test of whether a given expert was "retained" or whether a contract was formed. In certain circumstances it might be reasonable for an attorney or party to communicate confidential or privileged information to an expert in the absence of a formal contract and to expect those communications not to be used to the party's detriment. *Paul*, 123 F.R.D. at 278. In other situations, although a formal contract exists, so little of substance occurs within the relationship that neither the integrity of the judicial process or the interest of the party who retained the expert would be promoted by a blanket disqualification. *Paul*, 123 F.R.D. at 278. The court adopted a more reasoned approach in order to balance the interests involved. On the one side is the party's interest in protection of confidential communications or other privileged matter. On the other side is the opposing party's right to retain those persons it feels are needed to prosecute its

case. Also, at issue is the interest of experts to seek employment. Overlaying all these interests is the court's interest in protecting and preserving the integrity and fairness of the judicial proceedings before it.

The approach adopted by the court in *Paul* involved a two step analysis. The court stated:

> [T]he proper focus in such situations is to determine, first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate. Stating each proposition negatively, if any disclosures of privileged or confidential material were undertaken without a reasonable expectation that they would be so maintained (so that, in effect, any confidentiality or privilege relating to the matters communicated was waived), or if, despite the existence of a relationship conducive to such disclosures, no disclosures of any significance were made, it would seem inappropriate for the court to dictate to the expert or his new employer that his participation in the case be limited or eliminated.

*Paul*, 123 F.R.D. at 278.

In the *Paul* case, an attorney for the defendant, Rawlings Sporting Goods, retained Dr. Goldsmith on behalf of Rawlings. Dr. Goldsmith was an expert in the testing and design of safety helmets, including batting helmets. The *Paul* case involved a suit by the plaintiff against Rawlings arising out of an injury the plaintiff sustained when he was hit on the head by a pitched baseball while wearing a batting helmet manufactured by Rawlings. The defendant's attorney had retained Dr. Goldsmith primarily to consult on the setting up of a helmet testing laboratory for Rawlings and to do research in development-type activities. The facts underlying the suit against Rawlings by the plaintiff were mentioned in the course of this relationship. The court found the discussions of the suit to have been secondary to the purpose of developing a testing laboratory.

Ultimately, Dr. Goldsmith's relation with Rawlings terminated. Dr. Goldsmith was hired by the plaintiff, Michael Paul, as his expert, and Dr. Goldsmith did an investigation and submitted a report to the plaintiff. Rawlings moved to disqualify Dr. Goldsmith. The court found the relationship between Rawlings and Dr. Goldsmith to be sufficiently significant with respect to the question of the overall safety, design and testing of baseball helmets that as to any disclosures of confidential or privileged information, Rawlings could claim a reasonable expectation that such communications would not be used to its detriment. However, the court also found that Rawlings' attorney never communicated on matters of particular substance relating to the case including any particular theories of counsel. The court found the absence of any demonstrable prejudice to Rawlings, along with the absence of any advantage to the plaintiff, Michael Paul, the major determining factor in ruling not to disqualify Dr. Goldsmith. *Paul*, 123 F.R.D. at 280.

The court stressed that it is the nature of the communications between the attorney and the expert and the extent to which they appreciate the significance or confidentiality of the communications which is the crucial focus of the court's inquiry. *Paul*, 123 F.R.D. at 279, 280. The court, while stating that there is no "right" way to retain an expert in given situations, stressed that of the two parties to the attorney-expert relationship, the attorney as an expert in legal matters should be more aware both of the potential for privileged information to pass to the expert and for the need to insure against such information finding its way to an adversary. *Paul*, 123 F.R.D. at 279. The court found it appropriate in the first instance to place the burden upon the attorney of making sure an expert understands the nature of the relationship which exists and the need to protect certain information disclosed in the course of that relationship.

The court also declined to adopt, as suggested by some of the other courts which

have addressed the issue, the application of the presumption in attorney-client privilege cases, that once a confidential relationship is established, it is presumed that confidential communications were made and such communications will be used to the detriment of the communicating party. *Paul*, 123 F.R.D. at 280. As the court recognized, the presumption in the attorney-client area eliminates the need for a client to demonstrate that potentially prejudicial information was passed to his attorney by testifying about such communications. *Paul*, 123 F.R.D. at 281. Such a requirement would defeat the claimed privilege. Second, the presumption and resulting disqualification of an attorney who would represent adverse parties in the same litigation at different times, preserves the public trust in the integrity of the judicial system by preventing such an unseemly practice from occurring. *Paul*, 123 F.R.D. at 281. The attorney stands in a higher position of trust with its related fiduciary duties to the client than does an expert. *Paul*, 123 F.R.D. at 281. Experts perform very different functions in litigation than do attorneys. Experts are not advocates in the litigation sense but sources of information and opinions. Their role is to assist parties, and if they testify, to help the trier of fact understand the relevant evidence. *See Equal Employment Opportunity Commission v. Locals 14 and 15, International Union of Operating Engineers, et al.*, 24 F.E.P. Cases (BNA) 1821, 25 Empl.Prac. Dec. (CCH) P31, 783 (S.D.N.Y.1981) (rejected blind application to experts of attorney disciplinary rules, Canon 5, concerning loyalty to client).

The facts of the case before this court are unlike the few cases which have addressed the issue. The other cases involved the "switching sides" expert who at one time or another did work for a party's adversary. *See Conforti & Eisele, Inc. v. Division of Building and Construction, et al.*, 170 N.J.Super. 64, 405 A.2d 487 (1979); *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588 (D.Minn.1986); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271 (S.D.Ohio 1988); *Estate of George S. Halas, Sr., Deceased, et al. v.

Commissioner of IRS*, 58 Tax Ct. Mem. Dec. (CCH) 280 (1989). There is one case the court has found in which the disqualification issue involved the hiring by a party of an expert who was the partner in a consulting firm with the defendant's former consulting expert. *Equal Employment Opportunity Commission v. Locals 14 and 15, International Union of Operating Engineers, et al.*, 24 F.E.P. Cases (BNA) 1821, 25 Empl.Prac.Dec. (CCH) P31, 783 (S.D.N.Y.1981). The defendant's expert had provided two days of consultation to the defendant before he withdrew upon discovery of the conflict. The court found no leakage of confidential or privilege communications to have occurred and the risk of future leakage minimal. The court refused to disqualify the plaintiff's expert who was the partner of defendant's former expert under the facts of that case.

In the instant case, neither party has retained an expert that has worked or been associated with the opposing side. Neither party alleges it has disclosed confidential or privileged information to the opposing side's expert. Great Lakes retained Sague and Associates and through Sague and Associates, Dr. Leonard has provided consultation and opinions involving the subject matter of the litigation. FAG has retained Mr. Rumbarger and Franklin Research Center as its expert. Dr. Leonard's affidavit does not state that he did his work for Great Lakes through Franklin or that he ever discussed his work on the Great Lakes project with his co-workers at Franklin, including Mr. Rumbarger. Mr. Rumbarger in his affidavit denies any knowledge of Dr. Leonard's work for Great Lakes or any knowledge that such work was ever accomplished through the use of Franklin's facilities. There appears to have been no communication or "leakage" whatsoever of any information, whether confidential, privileged, or otherwise from Dr. Leonard to Mr. Rumbarger or Franklin. There is no relationship between Great Lakes and Mr. Rumbarger or Great Lakes and Franklin.

Under the analysis of the *Paul* case discussed above, there is no confidential or fiduciary relationship between Mr. Rumbarger and Great Lakes or Franklin and

Great Lakes such that Great Lakes could reasonably expect Mr. Rumbarger or Franklin to refrain from using confidential or privileged information communicated to them by Great Lakes to Great Lakes' detriment. Further, no such information was ever communicated. It is Dr. Leonard who owes a duty to Great Lakes not to disclose Great Lakes' confidences or his work product on their behalf to his coworkers at Franklin. Similarly, it is Mr. Rumbarger and Franklin who owe a duty not to disclose FAG's confidential or privileged information to Great Lakes' expert, Dr. Leonard. However, FAG knows of the fact that Dr. Leonard works at Franklin and apparently is willing to rely on Mr. Rumbarger and Franklin to take appropriate steps to protect its interests in the litigation. Additionally, as discussed in *Paul*, it is primarily the duty of each side's attorneys to take necessary steps to prevent possible future disclosures of their clients' confidential or privileged information. *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271 (S.D. Ohio 1988).

The court refuses to disqualify Mr. Rumbarger or Franklin Research Center at this time. The parties and their attorneys are well aware of the relevant relationships of the experts and are in a position to prevent any improper disclosures in the future. It would be inappropriate under these facts to interfere with FAG's choice of an expert or to force Mr. Rumbarger and Franklin to decline employment by FAG.

Great Lakes argues that Rule DR 5-105(D) of the Model Code of Professional Responsibility governing attorney conflict of interest should be applied by analogy to prevent Franklin and Mr. Rumbarger from representing a party with interests adverse to the interests represented by Franklin's employee, Dr. Leonard. DR 5-105(D) prevents two attorneys in the same firm from representing adverse parties to the same litigation at anytime. However, experts do not represent clients in the same sense that attorneys do, nor does the protection of the fairness and integrity of the judicial process require the courts to blindly treat experts like attorneys. The same rationale discussed in the *Paul* case for not blindly applying attorney disciplinary rules to an expert who switches sides applies equally well to the vicarious disqualification rule of DR 5-105(D).

The fact that Dr. Leonard and Mr. Rumbarger have worked together in bearing failure issues at Franklin does not alter the outcome. Such matters did not involve the particular bearing failure at issue in the instant litigation. Neither party has a privilege or confidentiality interest in general theories, knowledge or techniques employed by various experts in a field or used by these experts in the course of their employment at Franklin on unrelated bearing failure issues. It is the confidential or privileged information obtained by an expert from a party or a party's attorney and the expert's findings, opinions and advice which result from application of the expert's knowledge in his field to such information which is subject to protection by a court from improper disclosure to, or use by, an adversary in litigation.

It is also not that unusual for opposing experts in narrow fields of specialty to have had exposure to each others work and theories or even to have worked together in the past. That is a fact of life where there is a limited number of experts in a given field, or limited experts with experience in a particular type of case. In such situations, the experts who testify at trial will be in a position of disputing the findings or conclusions of those with which they have had prior or ongoing relationships. However, that is what expert witnesses do at trial. Cross-examination is designed to address these possible biases. The court perceives no need to exercise the extreme remedy of disqualifying an expert in this situation, unless there has been a disclosure of confidential or privileged information to the prejudice of a party due to the relationship of the experts, or that such a relationship between the experts poses a significant risk of such disclosure and resulting prejudice.

ORDERED: Plaintiff Great Lakes' motion to disqualify FAG's expert is denied.