Sterling E. CORDY, Plaintiff,

v.

The SHERWIN–WILLIAMS COMPANY,
et al., Defendants.

Civ. A. No. 94–184(JBS).

United States District Court,
D. New Jersey.

April 25, 1994.

William J. Cook, Michael Vassalotti, Brown & Connery, Westmont, NJ, for plaintiff.

Barbara J. Davis, John P. Penders, Marshall, Dennehey, Warner, Coleman & Goggin, Marlton, NJ, for defendants.

## *OPINION*

KUGLER, United States Magistrate Judge:

In this day of divided and shifting loyalties, when it is not unknown for lawyers to change firms in the middle of litigation,[1] we are faced with the phenomenon of an expert essentially doing the same thing by changing sides in the litigation. The question for the Court is whether he should get away with it.

The underlying lawsuit involves a claim by plaintiff Sterling Cordy for damages for massive injuries he suffered while riding his bicycle over a railroad track crossing in Lindenwold, New Jersey, on August 30, 1991. Plaintiff alleges that defendant Sherwin–Williams Company owns the crossing and is liable to him for damages.

Before the Court are cross-motions. Defendant first moved for an Order compelling Plaintiff's counsel to produce the bicycle for examination and testing by their expert, James Marley Green. Plaintiff moved for an Order barring Defendant from using Green as their expert, and further to disqualify the law firm of Marshall, Dennehey, Warner, Coleman & Goggin, from further representing Sherwin–Williams Company in this case. Plaintiff contends that he had first retained

Green to work on his behalf, and that Green changed sides in the middle of this litigation.

Both sides submitted briefs and affidavits. Because the affidavits raised stark factual disputes, the Court heard testimony on March 22, 1994, from Terrence Tuttle, William Cook, Esquire, Barbara J. Davis, Esquire, John Penders, Esquire and James Marley Green. Seventeen Plaintiff's exhibits (P–1 through and including P–17) and five defense exhibits (D–1 through and including D–5) were marked and received into evidence. Counsel subsequently sent the Court letters addressing the claim that Plaintiff's exhibit 10—a three-ring binder of allegedly confidential information that Plaintiff gave Green for review—was protected from disclosure. It was admitted under seal.

## I. *THE FACTS*

Having had an opportunity to review the affidavits and judge the credibility of the witnesses through hearing their testimony the Court makes the following findings:

1. James Marley Green is the principal of Resource Engineering, Inc. He is a forensic engineer who specializes in, among other things, accidents involving bicycles. He claims to be chairman of the Ethics Committee of the National Academy of Forensic Engineers. It is likely that he has sufficient training, education and knowledge to qualify as an expert witness in this case.

2. The law firm of Brown & Connery, representing Plaintiff, contacted James Green in May of 1993, for the purpose of consulting him in his professional capacity regarding this case. There were telephone calls on May 14, 1993, May 17, 1993 (twice) May 18, 1993, May 24, 1993, June 11, 1993 and July 1, 1993, from Brown & Connery to Resource Engineering (P–9). There were calls from Resource Engineering to Brown & Connery on May 14, 1993, May 17, 1993 and May 26, 1993 (D–4, D–5).

---

1. *See Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 281 (S.D.Ohio 1988) (the Court writes of the need to "preserve the public trust in the integrity of the judicial system by preventing an attorney from engaging in the unseemly practice of representing different parties to the same litigation at different times"); *Dewey v. R.J. Reynolds Tobacco Co.,* 109 N.J. 201, 221, 536 A.2d 243 (1988) (noting that "it does not require any remarkable sensitivity to recognize the ethical ramifications implicit in the circumstances of many lawyer-shifting situations").

3. Green prepared and submitted a retainer agreement to Brown & Connery. When he realized it hadn't been signed by an attorney from the firm he resubmitted it to the firm on May 27, 1993, for the signature of an attorney (P–3).

4. William Cook, Esquire, ultimately signed the retainer agreement on behalf of Brown & Connery on June 1, 1993. Green had signed on behalf of Resource Engineering on May 27, 1993.

5. Brown & Connery forwarded a check, payable to Resource Engineering, in the amount of $3,000, to Resource on May 24, 1993 (P–2). Resource deposited the check in its bank account on May 25, 1993 (P–2) and acknowledged its receipt by invoice to Brown & Connery dated May 28, 1993 (P–4).

6. Cook forwarded to Green under cover of a letter dated May 24, 1993, a three ring binder containing the investigation conducted by plaintiff's counsel (P–10).[2] This includes a cover letter with counsel's impression of the case, a police report, witness interview, summary memorandum photographs, and an Engineering Report of another expert.

7. Resource forwarded Brown & Connery a bill dated June 28, 1993, for 27 hours of work done on behalf of Plaintiff in investigating this claim (P–5). The invoice shows an outstanding balance due of $2,094.23.

8. By letter of July 1, 1993 (faxed the same day), to Green, Cook complains of the bill of June 28, 1993. This letter ends with: "Where is your report? Please advise." (P–11).

9. Green never rendered a written report to Brown & Connery.

10. By letter dated July 6, 1993, to Cook, Green invoked the 30–day resignation provision of the retainer agreement and returned the $3,000, retainer (P–13).

11. Green did render at least one oral opinion to Plaintiff's firm concerning the cause of the accident. There is a heated dispute as to the nature of that opinion and the time when it was communicated to Brown & Connery:

a. Terrence Tuttle, a paralegal employed by Brown & Connery, testified consistently with a memorandum he prepared dated May 26, 1993, and marked P–8. Essentially, he recalls that Green indicated that the accident was caused by the railroad track and not the bicycle. Tuttle believes this conversation took place in May of 1993, but cannot provide an exact date. Finding 2, *ante*, indicates the dates of those calls, but the longest was 2.8 minutes (May 17, 1993). It is unlikely that Tuttle and Green could have discussed his opinion in that short a time. However, the May 17, 1993, call from Resource to Brown & Connery lasted 20.6 minutes, and the call of May 26, 1993, lasted 5.5 minutes. Either would seem of sufficient duration for Green to disclose his opinion.

b. Green testified that sometime in mid-June he informed Brown & Connery that they had no case against the owner of the railroad crossing. Green has no record of any such call. The call of June 11, 1993, from Brown & Connery to Resource, lasted one minute and does not seem long enough for the parties to have discussed Green's opinion. However, there is a ref-

---

**2.** Brown & Connery submitted P–10 to the Court for an *in camera* inspection. Relying on *Sporck v. Peil*, 759 F.2d 312 (3d Cir.1985), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985), Plaintiff's counsel contends it is not subject to disclosure to defense counsel. Defendant attempts to demonstrate that any privilege has been waived because Plaintiff has already supplied that which is contained in P–10 to Defendants during the course of discovery. Plaintiff's counsel is correct in his reading of *Sporck,* and the Court will not compel production of P–10 to defense counsel.

The case of *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3d Cir.1984) more clearly applies to these facts. In *Bogosian,* the Third Circuit determined that the mental impressions of an attorney that are disclosed to an expert remain protected by privilege, subject to exception if the expert discloses the work product, or if the attorney is suspected of wrongdoings. *See e.g., Occulto v. Admar of New Jersey, Inc.*, 125 F.R.D. 611 (D.N.J. 1989) (no protection for attorney letter to expert where attorney found to have prepared the expert report, for the expert merely to sign). The application of *Sporck* instead of *Bogosian* to the present case leads to the same conclusion that privilege applies.

erence in the invoice dated June 18, 1993, for eight hours of work for Brown & Connery. And it begins, "as directed by attorney ..."[3]

12. Green and Plaintiff's firm discussed potential defendants in this lawsuit. When that occurred is not clear.

13. Green maintained no notes, records or memoranda of his discussions with Plaintiff's law firm. Green has no record of any telephone calls to Plaintiff's firm in mid-June, 1993. He cannot locate any hotel or motel records for that period which reflect a telephone call to plaintiff's law firm.

14. The repeated references in Green's affidavits to conversations he had with Cook are incorrect. Green never spoke with Cook. Green actually spoke at all times with Tuttle.[4]

15. The initial contact between Green and defense counsel was initiated by Barbara J. Davis, of Marshall, Dennehey, Warner, Coleman & Goggin, an associate in the New Jersey office. She testified that she made a number of unsuccessful attempts to call Green. It is not clear when they first spoke. Green believes it to have been October 18, 1993.

16. Davis testified that during the initial conversation, Green revealed that he had been "consulted" by Brown & Connery. She was "not sure" if he had stated that there had been a written agreement between Brown & Connery and Resource Engineering at one time. She states that once he revealed his contact with Plaintiff's firm, she didn't want to discuss it further without speaking with John P. Penders, the partner at her firm in charge of the file.

17. Davis testified that during her initial contacts with Green, he did not reveal that he had rendered any opinions to Plaintiff's firm. She does not recall learning that he had rendered an oral opinion until receiving a copy of Green's affidavit which was filed in connection with these motions. Penders testified that he knew before authorizing Green's employment (during the initial contacts) that Green had given an oral opinion to Brown & Connery which was unfavorable to Plaintiff. His information came, in part, from Davis.[5]

18. Green prepared and sent to Davis a retainer agreement dated October 29, 1993. Except for the names, it is identical to the prior agreement with Brown & Connery. Davis signed it on November 13, 1993, on behalf of the law firm which employs her (P–12). She testified that she believed she had retained Resource Engineering on behalf of her firm when she signed the agreement.

19. Davis sent a letter to Green dated November 10, 1993 (D–2). This letter purports to "confirm" the conversation in which Green revealed he had been "consulted" by Plaintiff's counsel. In the letter, Davis requested that Green not "disclose any information provided to you by the plaintiff's attorney or any documents that you received from their office." The final substantive sentence reads:

> At no time have you advised my office whether you were consulted by plaintiff's attorney concerning any claims against the bicycle manufacturer, the authorities who control the roadway where the accident occurred, or the owner of the railroad tracks.[6]

20. Plaintiff's firm first learned on November 24, 1993, that defense counsel had

---

**3.** It is not necessary for this Court to resolve this conflict, although it could if necessary without great difficulty.

**4.** Cook's affidavit and testimony stated that he never spoke with Green. Tuttle's affidavit and testimony were that he spoke with Green on behalf of the firm. Green's first written communication with Brown & Connery was addressed to Tuttle (P–1). On direct examination, Green stated that he could not recall who at Brown & Connery he spoke with. On cross-examination, he acknowledged that he never spoke with Cook.

**5.** This conflict is irreconcilable. It does not give this Court a great deal of confidence in the testimony of these two attorneys (one of whom was admitted *pro hac vice* to practice in this Court).

**6.** This cannot be accurate. As noted, at the very least Penders knew Green had rendered an oral opinion to Brown & Connery. Penders also testified that he had consulted with Davis before she sent this letter.

retained Green. Plaintiff immediately objected (P–7).

21. Green submitted bills to Davis dated November 28, 1993, (P–14), December 28, 1993, (P–15), and January 28, 1994, (P–16). The total billings to that point exceeded $14,500.00.

22. By letter dated December 10, 1993, Green estimated that the total cost "for the engineering necessary to define the causal factors of the subject accident" on behalf of defendant Sherwin–Williams was $104,000.00.[7]

23. By letter of January 18, 1994, to Davis, Green rendered a "preliminary Professional Engineering Opinion" to the effect that the accident was caused by a defect in the bicycle, not by the railroad crossing (P–13).

24. There is no evidence that Green directly imparted to Davis (or anyone else in her law firm or employed by her client) any of the information he learned from Brown & Connery.

25. Green testified that nothing he did violated any standards of his profession.

26. There is no evidence that either party is unable to secure another expert on bicycle accident cases.

## II. *WHICH LAW APPLIES?*

■ Defense counsel claims that federal law controls the disqualification issue. Plaintiff's counsel doesn't directly argue the point, but relies heavily on New Jersey state law in urging disqualification. There is almost no case law on this point.[8] Defendant contends that since the Federal Rules of Evidence govern the admissibility of expert testimony, "it follows logically that Federal law should also govern the question of expert disqualification."

However, Federal Rule of Evidence 501 provides that,

... in civil actions ... with respect to an element of a claim ... as to which State law supplies the rule of decision, the privilege of a witness ... shall be determined in accordance with State law.

This case involves a state law negligence claim. Diversity of citizenship supplies this Court's jurisdiction over the claim pursuant to 28 U.S.C. Section 1332. Questions of work product privilege and attorney-client privilege are raised in support of this motion to disqualify Green.

The Supreme Court in *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), permitted the exclusion of trial preparation materials when offered in a criminal trial. One commentator has since concluded that the work product rule, which was originally considered to be an immunity, has been turned into a "privilege" subject to Rule 501. Charles Alan Wright and Kenneth W. Graham, 23 *Federal Practice and Procedure Evidence,* § 5423 (1980 ed.) (pp. 699–700). *Contra Airheart v. Chicago & N.W. Transp. Co.,* 128 F.R.D. 669, 670–71 (D.S.D. 1989); *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.,* 123 F.R.D. 198, 201 (M.D.N.C.1988) (work product doctrine is not a privilege for purposes of Rule 501).

This Court need not determine which law applies. There is no substantial difference between federal and state law principles on this question.[9] Both lead to the same result. This Court will therefore rely both on federal and state cases in arriving at its conclusion.

## III. *APPLICABLE LAW*

■ Any analysis properly begins with a recognition of the Court's inherent power to disqualify experts. *English Feedlot, Inc. v.*

---

**7.** Plaintiff's counsel hints that this enormous amount of money explains why Green went to work for the defendant. The Court need not ascribe any such motive to Green in order to reach a decision.

**8.** The only case the Court could locate on this issue is *Nikkal Industries, Ltd. v. Salton, Inc.,* 689 F.Supp. 187 (S.D.N.Y.1988) which applied federal law to the question.

**9.** To the extent there is any difference, this court would favor state cases in order to avoid any inconsistency between state and federal courts within New Jersey. This case was originally filed in the Superior Court of New Jersey and was removed by defendant. The claim is strictly one of New Jersey tort law.

*Norden Labs., Inc.*, 833 F.Supp. 1498, 1501 (D.Colo.1993) (citing *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F.Supp. 334, 336 (N.D.Ill.1990)). The expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than attorneys. *Id.* Experts are not advocates in the litigation but sources of information and opinions. Because experts and attorneys perform different functions in litigation, the standards and presumptions applicable to the attorney-client relationship have little bearing on an expert's disqualification. *Id.*

▇ The party seeking disqualification bears the burden of establishing both the existence of confidentiality and its non-waiver. *Id.* at 1502 (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.C.C.1991)). Of the two participants in an attorney-expert relationship, however, the attorney, being an expert in legal matters, should be more aware both of the potential for privileged information to pass to the expert, and for the need to insure against such information finding its way into the hands of the adversary. *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 279 (S.D.Ohio 1988). Here, Plaintiff's counsel is the party seeking to disqualify Mr. Green. Therefore, Plaintiff's counsel bears the burden of proof.

Some jurisdictions have established a two-step inquiry to determine whether to disqualify an expert who had prior relationship with a party. *Id.* First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert? *Id.* (citing *Mayer v. Dell*, 139 F.R.D. at 3). Hence, if any confidential disclosures were undertaken without an objectively reasonable expectation that they would be so maintained (effecting a waiver of confidentiality), or if, despite a relationship conducive to such disclosures, no significant disclosures were made, disqualification is inappropriate. *Id.*

(citing *Paul v. Rawlings*, 123 F.R.D. 271, 278 (S.D.Ohio 1988)).

In addition to the above analysis, the Court should balance the competing policy objectives in determining expert disqualification. *See generally Paul*, 123 F.R.D. at 282. The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process. *Id.* at 277–78. The main policy objectives militating against disqualification are ensuring access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling. *English Feedlot*, 833 F.Supp. 1498, 1505 (D.Colo.1993) (citing *Palmer v. Ozbek*, 144 F.R.D. 66, 67 (D.Md.1992)). Courts have also expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party. *Id.*

▇ Under Federal Rule of Civil Procedure 26, the opposition is entitled to obtain information upon which a testifying expert intends to rely in formulating his or her opinions.[10] Generally, when an expert obtains information from Plaintiff's attorneys, who in turn have obtained that information from the client, the attorney-client privilege applies, subject to a variety of qualifications. *See* Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence,* § 503(a)(3)[01](3) (p. 503–38) (1986).

The leading state case on expert disqualification is *Graham v. Gielchinsky*, 126 N.J. 361, 599 A.2d 149 (1991), which held that in the absence of exceptional circumstances, courts could not permit opinion-testimony by an expert originally consulted by an adversary. In *Conforti & Eisele, Inc. v. Division of Building and Construction*, 170 N.J.Super. 64, 405 A.2d 487 (L.Div.1979), the Court disqualified an expert witness hired by the defendant to consult on construction claims related to several phases of a construction project, and who was subsequently hired by the plaintiff with respect to later phases of

---

**10.** The Federal Rules were amended in 1993; Rules 26(a)(2) and 26(b)(4) now govern discovery regarding expert witnesses.

the same project. That Court found two different bases which could be used to order disqualification: attorney-client privilege and fundamental fairness.

We now turn to Plaintiff's Motion to Disqualify Green from serving as an expert for defendant Sherwin–Williams.

## IV. *THE EXPERT*

### A. *RETAINER?*

■ Defendant contends that one reason the Court should not disqualify Green is because Brown & Connery never "retained" him. This argument is based in part on Green's conduct in returning the original retainer payment after he resigned in July, 1993.

Nonsense. Green accepted a retainer from Plaintiff, and later returned it. The fact that he returned it cannot erase his acceptance of it, the significance of it, or the implications arising from it when he later accepted a retainer from Defendant.

Defendant also contends that Green only had "minimal contacts" [11] with Brown & Connery. However, there is no question that Green performed services for Brown & Connery. He entered into a written contract. He was paid. He learned their litigation strategy and reviewed their investigation. He billed for 28 hours of work. He rendered some kind of oral opinion. There was extensive contact between Green and Brown & Connery. Their relationship was clearly not a preliminary interview or consultation in order to determine whether an attorney desired to enter into a relationship with an expert. *See Nikkal Industries,* 689 F.Supp. at 190 (no evidence that the meeting between plaintiff and the expert "constituted anything more than an employment style interview"). Nor was the relationship "tenuous." *Paul,* 123 F.R.D. at 279.

Davis testified that, in her opinion, she had "retained" Green on behalf of Defendant when she signed the agreement with Green and sent him a check. Defendant failed to explain why a different standard should apply to Plaintiff's firm.

Clearly Brown & Connery retained Green.

### B. *CONFIDENTIALITY*

■ Defendant contends that Brown & Connery never shared any confidential information with Green. Counsel points to the lack of any "Confidentiality Agreement" or commitment that Green would not work for any other party involved in the lawsuit, relying on *Wang Laboratories, Inc. v. Toshiba Corporation,* 762 F.Supp. 1246, 1250 (E.D.Va.1991) (suggesting the steps that an attorney should take to make sure the expert knows that confidentiality is expected) and *English Feedlot,* 833 F.Supp. at 1505 ("... a lawyer seeking to retain an expert and establish a confidential relationship should make this intention unmistakably clear and should confirm it in writing").

But there is no "right" way for an attorney to retain an expert for purposes of litigation. *Paul,* 123 F.R.D. at 279. No case in New Jersey has held than an attorney must go through the formalistic rituals suggested in *Wang Laboratories,* and this Court declines the invitation to be the first.

The real question is whether Brown & Connery acted reasonably in assuming that a confidential or fiduciary relationship existed with Green. *Palmer v. Ozbek,* 144 F.R.D. 66, 67 (D.Md.1992). The answer is yes.

Some of the contents of P–10 (the three-ring binder sent by Brown & Connery to Green) are clearly confidential and not subject to disclosure. The selection process used to assemble P–10, and the grouping of the photographs and documents represent the mental impressions of Plaintiff's counsel and are protected work product. *Sporck,* 759 F.2d at 315. Green acknowledges that Plaintiff's firm informed him of their theory of the case and their targeted defendants. This also was protected work product. *Conforti,* 170 N.J.Super. at 73, 405 A.2d 487 (the expert "was privy to confidential documents as well as the mental impressions, opinions and legal theories of counsel"); *see Paul,* 123 F.R.D. at 280 (noting that the information

---

11. Obviously counsel doesn't mean this in the due process sense.

passed on to the expert did not involve the theories of the party seeking disqualification).

Although the law will presume a relationship of confidence when it is just to do so, *Conforti,* 170 N.J.Super. at 73, 405 A.2d 487, the evidence here of a direct confidential relationship between Green and Brown & Connery is overwhelming. Plaintiff's counsel had every reason to assume that it had entered into a confidential relationship with Green. Plaintiff's counsel passed confidential information to Green. It is simply not possible for Green to ignore what he learned from Brown & Connery. At the very least, his engagement with Brown & Connery has to "subliminally affect his testimony and assessment of facts." *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 83 Civ. 8898, 1989 WL 31514, *3 (S.D.N.Y.)

### C. DISQUALIFICATION

■ The application to disqualify Green is not difficult. As stated in *Wang Laboratories:*

> To be sure, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party pursuant to the earlier retention. This is a clear case for disqualification.

762 F.Supp. at 1248. This is just such a case. Having found that Brown & Connery retained Green and that Green received confidential information, the Court will grant Plaintiff's application to disqualify James Marley Green from serving as an expert witness, either in Court or as a consultant for Defendant on this case.

Defendant however, raises additional issues. First, counsel seems to imply that Plaintiff's counsel engaged Green simply to disqualify him from serving as an expert for the other side. That kind of odious practice is roundly condemned. *See Paul,* 123 F.R.D. at 281–82; *English Feedlot,* 833 F.Supp. at 1505; *Palmer,* 144 F.R.D. at 67. However, there is no evidence this was Plaintiff's purpose, and the Court will not impute such motives to one of its own officers. *W.R.*

*Grace & Co. v. Gracecare, Inc.,* 152 F.R.D. 61, 63 n. 4 (D.Md.1993).

Moreover, there is no evidence that either side is unable to secure another expert. Although counsel may feel Green is a "world respected expert on the subject of bicycle accident reconstruction and railroad grade crossing accident[s]," Db–19, there is no evidence of anything unique about his services. *See Wang Laboratories,* 762 F.Supp. at 1249 n. 6 ("a different result might be warranted if the consultant involved were unique in some relevant sense"). The business of being an expert has become a cottage industry. *Graham,* 126 N.J. at 373, 599 A.2d 149 (quoting from McLaughlin, *Discovery and Admissibility of Expert Testimony,* 63 Notre Dame L.Rev. 760, 763 (1988)).

Second, counsel emphasized at oral argument that Green never gave any *written* opinion to Brown & Connery. This distinction makes no difference in the Court's conclusion. Green gave an opinion on liability to Brown & Connery. Neither the substance of that opinion, nor its form makes any difference. To reach that point, Green had to have analyzed the "facts" as he knew them and applied his learning and expertise to those "facts." That is the very process that makes him an "expert." So, regardless of whether his opinion ever appeared in writing, the Court can only conclude that Green acted as an expert when divulging his opinion to Brown & Connery regarding the causal factors in this accident.

This Court need not impute any evil motive to either Green or Defendant's law firm. This analysis does not seek out intentional wrongdoing but addresses an issue of fairness. Any party to a lawsuit who retains an expert should not have to worry that the expert will change sides in the middle of the proceeding. To hold otherwise would adversely affect the confidence parties place in this system of justice. As noted in *American Protection Insurance Co. v. MGM Grand Hotel–Las Vegas, Inc.,* CV–LV 82–26 (HDM), 1986 WL 57464 (D.Nev.):

> Were the most important witness' assistance in the litigation to be sold to the highest bidder, the court's integrity would be discredited. In addition, the public es-

timation of the judicial system would be diminished.

Accordingly, plaintiff's Motion to Disqualify James Marley Green from serving as an expert for defendant Sherwin–Williams shall be granted. The Order shall also provide that any work done to date so far by Green shall not inure to the benefit of defendant Sherwin–Williams.[12]

The Court now turns to the application to disqualify defense counsel.

## V. THE LAW FIRM

■■■■■ Under New Jersey law, the party who brings a disqualification motion concerning an adverse attorney bears the burden of proving that disqualification is appropriate. *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo,* 144 F.R.D. 235, 238 (D.N.J.1992). Thus Plaintiff bears the burden here.

Normally, the United States District Court must first look to the New Jersey Rules of Professional Conduct ("R.P.C.") to see if they govern the issue. *Kaselaan,* 144 F.R.D. at 237–38. Rule 6A of the General Rules of the United States District Court for the District of New Jersey provides in essence that the ethical rules and constraints imposed on federal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the New Jersey Supreme Court. Allyn Z. Lite, *New Jersey Federal Practice Rules* 31–32 (1992 ed.)

No specific Rule of Professional Conduct applies here. The closest would be Rule 1.7(c)(2), which provides that:

[I]n certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to the public interest.

By its terms, Rule 1.7(c)(2) applies only to cases of "multiple representation." But remove that qualification, and the spirit of the rule is instructive. Moreover, General Rule

6A permits the United States District Court to depart from the New Jersey Supreme Court's professional conduct rules in certain circumstances. Rule 6A reads as follows:

The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law.

In *MMR/Wallace Power & Industrial, Inc. v. Thames Associates,* 764 F.Supp. 712 (D.Conn.1991), the plaintiff moved to disqualify defense counsel (Forstadt) because counsel made unauthorized *ex parte* contact with a former employee of plaintiff (Willett) who had been a member of their litigation team. The Court adopted a three-part analysis: 1) did the ex-employee have confidential information pertaining to plaintiff's trial preparation and strategy?; 2) did he disclose it to defense counsel?; and 3) if he did disclose it, does counsel's continued representation of defendant threaten to "taint" all further proceedings? *Id.* at 724.

The Court concluded that the ex-employee had in fact obtained confidential information about the case while working with plaintiff's counsel. *Id.* at 726. Turning to the more difficult questions, the Court concluded that "a presumption arises that confidences were, in fact, shared." *Id.*

The Court did not decide whether such a presumption is rebuttable, noting a split in authorities. *Id.* Finding that defendant failed to sustain its burden of rebutting the presumption, the Court ordered disqualification of defense counsel. *Id.* at 726–27.

Instructive is the following passage:

To condone such conduct, and simply allow Willett to switch camps could, by potentially giving [defendant] unrestricted access to plaintiff's trial strategies and tactics, have a devastating effect on the outcome of the litigation. Even if, as defendant maintains, no confidential information was actu-

---

**12.** Plaintiff's counsel has represented that he will permit inspection of the bicycle by defendant's expert. Defendant's motion to compel inspection is therefore dismissed without prejudice.

ally disclosed, Forstadt's alliance with Willett creates a "nagging suspicion" that [defendant's] preparation and presentation had already been unfairly benefitted. *Id.* at 727.

Defense counsel's conduct "can hardly be said to demonstrate 'a cautious regard for the disciplinary rules'" *Id.* At the very least, defense counsel should have contacted Plaintiff's counsel to find out what their relationship was with the ex-employee "before offering him a consulting contract." *Id.* Although the Court was reluctant to disqualify counsel, it concluded that "[t]his appears to be one of those 'unusual situations' where the appearance of impropriety is clearly sufficient to warrant so drastic a remedy." *Id.* at 728.

In disqualification situations, any doubt is to be resolved in favor of disqualification. *Hull v. Celanese Corporation,* 513 F.2d 568, 571 (2d. Cir.1975); *Liu v. Real Estate Inv. Group, Inc.,* 771 F.Supp. 83, 86 (S.D.N.Y. 1991); *see also Kaselaan,* 144 F.R.D. at 238 ([p]laintiffs therefore bear the burden of proving that disqualification is appropriate either because the New Jersey Rules of Professional Conduct are violated or because sufficient doubt exists as to the propriety of representation). It is clear why this presumption arises that confidences passed to the attorney. There is an inherent difficulty in determining, at some later time, whether it happened. Self-serving affidavits of counsel and others are not helpful because of their "undeniable interest in preserving any tactical advantage they may have garnered." *MMR/Wallace,* 764 F.Supp. at 726–27. Moreover, a non-lawyer would be more likely to reveal confidential information because he or she might not be as sensitive to the need to safeguard the information as would an attorney. *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037, 1043 (W.D.Mo. 1984); *MMR/Wallace,* 764 F.Supp. at 727.

Applying these principles to this matter yields a clear case for disqualification. The Court realizes that defendant Sherwin–Williams has an interest in being represented by Davis and Penders. Nevertheless, the fairness and integrity of the judicial process and Plaintiff's interest in a trial free from the risk that confidential information has been unfairly used against him must also be considered and outweighs Defendant's interest. *Williams,* 588 F.Supp. at 1046. The preservation of public trust is paramount. *Hull,* 513 F.2d at 572.

Here, the expert Green did receive confidential information from Brown & Connery. He was privy to their trial strategy. Although he and defense counsel deny that he ever divulged it to his new employer, their protestations are unavailing. To believe Green did not and will not remember and ultimately use that information, even "subliminally," *see Michelson, supra,* defies common sense and human nature. Defense counsel did nothing to discover the real nature of the relationship between Green and Brown & Connery. Whether they chose to ignore warning signs or actually encouraged Green's misconduct need not be decided. Defense counsel's conduct was wanting.

Plaintiff has met the burden of proving that "sufficient doubt exists as to the propriety of representation" of defendant Sherwin–Williams, by Penders and Davis. *Kaselaan,* 144 F.R.D. at 238. This is a clear case for disqualification. Plaintiff's interest in a trial free from the risk that confidential information will be used against him and the public's interest in the integrity of the judicial process itself demand it. It is not sufficient simply to disqualify the expert to deter such conduct in the future. Counsel must also understand they are at some risk should they encourage (or fail to discourage) this kind of behavior.

Accordingly, Penders and Davis must be disqualified. In addition to their disqualification as Defendant's counsel, this Court also concludes that their firm, Marshall, Dennehey, Warner, Coleman & Goggin, must also be disqualified. Though not clearly mandated by Rule of Professional Conduct 1.10(a),[13] the rationale for that Rule clearly applies here. The Court recognizes the importance

---

**13.** Rule 1.10(a) provides that, when lawyers are associated in a law firm, "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7, RPC 1.8, RPC 1.9, or RPC 2.2."

of avoiding the appearance of impropriety, as reflected by the ethics rules. The Court therefore imputes the disclosures to the entire firm, and broadens the scope of disqualification to include all attorneys at the firm.

The Court is also concerned that Defendant Sherwin–Williams has the benefit, through counsel, of the misconduct of the expert Green. The Order to be issued concurrently with this Opinion provides that the disqualified parties may no longer communicate with Sherwin–Williams regarding this case. Furthermore, neither the disqualified parties nor Sherwin–Williams may communicate anything having to do with Green and his employment with new counsel. Defendant Sherwin–Williams shall have thirty (30) days to select new counsel and enter counsel's appearance.

## VI. CONCLUSION

For the reasons expressed, Plaintiff's application to bar defendant Sherwin–Williams from using James M. Green, is granted. Plaintiff's Motion to disqualify John Penders, Barbara Davis and Marshall, Dennehey, Warner, Coleman & Goggin, is granted. Defendant's Motion to compel production of the subject bicycle for inspection by Defendant and its expert is dismissed as moot.

### ORDER

**THIS MATTER** having come before the Court upon the Motion of counsel for Defendant Sherwin–Williams for an Order Compelling Plaintiff's counsel produce for inspection the bicycle operated by Plaintiff at the time of the accident, and the Cross–Motion of plaintiff's counsel to disqualify James M. Green from serving as an expert for Defendants and to further disqualify Marshall, Dennehey, Warner, Coleman & Goggin, from representing Sherwin–Williams; and

**THE COURT** having reviewed the Briefs submitted in this matter, having heard testimony on March 23, 1994, from Terrence Tuttle, Willliam Cook, Esq., Barbara J. Davis, Esq., John P. Penders, Esq., and James M. Green, and the Court having heard the argument of counsel on March 23, 1994; and for the reasons expressed in the Court's Opinion filed this date;

**IT IS ON THIS** 5th day of April, 1994, **ORDERED:**

1. Defendant's Motion to compel Plaintiff to produce the bicycle for inspection is **DENIED** as moot because of the representation by Plaintiff's counsel that he will permit inspection of the bicycle;

2. Plaintiff's Motion to disqualify James M. Green, as an expert on behalf of Defendant is **GRANTED,** and defendant is prohibited from consulting with or using the services of or relying upon the advice or opinions of James M. Green, in any way, directly or indirectly;

3. Defendant Sherwin–Williams is further directed to segregate any correspondence, notes, memoranda, writings, or communications in whatever form, containing any advice, opinion, recitation or consultation of James M. Green, and defendant Sherwin–Williams is further prohibited from providing any of the foregoing information to its counsel, employees (present, future and former), consultants, exerts, or anyone else connected in any way, directly or indirectly, with this litigation;

4. The law firm of Marshall, Dennehey, Warner, Coleman & Goggin, and its attorneys, employees, and consultants is disqualified and barred from future representation of Sherwin–Williams in this and any other litigation arising from the accident which forms the basis of this Complaint. The law firm, its employees (past, present and future) and consultants are further prohibited from communicating with any new attorney for Sherwin–Williams, or that attorneys' employees, consultants or experts, regarding any matters which could reveal, directly or indirectly, any communication in whatever form, with James M. Green concerning this litigation.

5. The Court shall hold a Status Conference on **May 23, 1994, at 2:30 P.M.,** at which time Sherwin–Williams shall be represented by new counsel. The Court shall enter a Scheduling Order at that time.

6. The Court finds that Plaintiff's Exhibit 10 is protected from disclosure by the work product privilege. Plaintiff's law firm is directed to collect Plaintiff's Exhibit 10 from

the Court. Counsel is further directed to maintain Exhibit 10 in the same condition as it was received, until such time as the time for appeal from this Order expires.